H. George DENT, Jr.; Ashley Realty Company, Inc., a South Carolina Corporation; and Southern Dredging Co., Inc., a South Carolina Corporation, Plaintiffs,

v.

BEAZER MATERIALS AND SERVICES, INC. and Beazer East, Inc., Successors in Interest to Koppers Company, Inc.; Agrico Chemical Company, Continental Oil Company, American Agricultural Chemical Company; and Fos–Kem Liquidation Corporation, Defendants, of whom

BEAZER MATERIALS AND SERVICES, INC., and Beazer East, Inc., Successors in Interest to Koppers Company, Inc., Agrico Chemical Company, Continental Oil Company, American Agricultural Company, and Fos–Kem Liquidation Corporation, are Third–Party Plaintiffs,

v.

BRASWELL SHIPYARDS, INC., Third Party Defendant.

Civil Action No. 2:89–2851–8.

United States District Court, D. South Carolina, Charleston Division.

Dec. 28, 1995.

Timothy William Bouch, William Jefferson Leath, Jr., Young, Clement, Rivers & Tisdale, Charleston, for H. George Dent, Jr., Ashley Realty Co. and Southern Dredging Co.

Robert Erving Stepp, Glenn Murphy Gray and Stepp LLP, Columbia, SC, Elizabeth Henry Warner, Buist, Moore, Smythe & McGee, PA, Charleston, SC, for Beazer Materials and Services, Inc.

Mark R. Zehler, Houston, TX, P. Michael Duffy, Michael A. Scardato, Charleston, SC, (Conoco), Samuel J. Morley, Harry R. Detwiler, Jr., Tallahassee, FL, William L. Want, Charleston, SC, (Agrico) for Defendants.

## ORDER

BLATT, Senior District Judge.

## I. *BACKGROUND*

From 1930 to 1977, Koppers Company, Inc. (hereinafter "Koppers"), now known as Beazer East, Inc. (hereinafter "Beazer")[1], operated a wood treating plant on approximately 45 acres of property in a part of Charleston, South Carolina known as the "neck" area.

The property immediately south of the former Koppers property (tax map numbers 464–00–00–012 and –029) was originally the location of Ashepoo Phosphate Works and is what is described as the Dent property for purposes of this case.

All of the various claims arise from the necessary remediation (clean-up) of creosote contamination generated by the wood treating plant operated by Koppers on the property adjacent to the Dent property. Both properties are now part of a proposed Superfund site. The United States is not a party to this suit since the CERCLA claims were brought as private party actions under that statute. Conoco has a common law claim against Beazer arising from an indemnity provision in a lease agreement for the use of a portion of the Dent property by Koppers during Conoco's ownership of the property. Agrico has a common law claim for equitable indemnification against Beazer for the contamination of the property during Agrico's ownership of the Dent property. This order addresses the responsibilities of the respective parties for the necessary remediation of the site under CERCLA, as well as the common law indemnification claims against Beazer.

This action was originally brought by plaintiffs H. George Dent, Jr., Ashley Realty Company, Inc., and Southern Dredging Company, Inc., ("the Dent plaintiffs") against defendants Beazer East, Inc. ("Beazer"), Agrico Chemical Company ("Agrico"), Conti-nental Oil Company, American Agricultural Chemical Company and Fos–Kem Liquidation Company (collectively "Conoco") seeking recovery under various common law causes of action and under CERCLA.[2]

Beazer asserted cross claims against Conoco and Agrico and a third party claim against Braswell Shipyards ("Braswell"). Conoco and Agrico asserted cross claims against Beazer and filed third party claims against Braswell. Conoco and Agrico's third party claims were resolved by consent order prior to trial. All defendants settled with the Dent plaintiffs prior to trial. Following the trial, Beazer settled its claims with Braswell. The only remaining claims are cross claims between the defendants.

This court held a bifurcated trial, with a jury and a non-jury phase. In the first phase, beginning September 22, 1993, the common law claims and two factual issues regarding indemnity claims by the defendants Conoco and Agrico against the defendant Beazer were submitted to the jury. Following the first phase of the trial, the CERCLA portion was tried before this court sitting without a jury beginning on October 18, 1993. With regard to the remaining issues before the court, each party seeks the following relief:

Beazer seeks:

1. Contribution for response costs it incurred at the Dent Property with regard to wood treating constituents, pursuant to § 107(a) of CERCLA;

2. Recovery of response costs it incurred at the Dent Property with regard to fertilizer constituents pursuant to § 107(a) of CERCLA;

3. Contribution for response costs relating to the release or disposal of hazardous substances on the Dent Property pursuant to § 113(f)(1) of CERCLA; and

---

1. The former Koppers Company, Inc. was purchased by Beazer, and its name was changed to Beazer East, Inc. Beazer assumed all liability incurred by the former Koppers Company. (Jury.Excerpt, p. 3, ls. 17–20, September 27, 1993).

2. CERCLA is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended. 42 U.S.C. § 9601, *et seq.*

4. A declaration liability for future costs under § 113(g)(2) of CERCLA, without an allocation of any such costs.

Conoco seeks:

1. Contribution for response costs pursuant to § 113(f)(1);

2. A declaration of liability for future response costs under § 113(g)(2) of CERCLA, with an allocation of such costs; and

3. Recovery of settlement costs, attorneys' fees and expert fees under contractual and equitable indemnity theories.

Agrico seeks:

1. Contribution for response costs pursuant to § 113(f)(1);

2. A declaration of liability for future response costs under § 113(g)(2) of CERCLA, with an allocation of such costs; and

3. Recovery of settlement costs and attorneys' fees under an equitable indemnity theory.

## II. STIPULATIONS

In the interest of judicial economy, and for the convenience of the jury, the parties to this action stipulated and agreed to the following statement of facts:

1. The former Koppers Co., Inc. was purchased by Beazer, and its name was changed to Beazer East, Inc. Beazer East, Inc. assumes all liability incurred by the former Koppers Company. (Jury Tr. Excerpt p. 3, ls. 17–20, September 27, 1993).

2. The Continental Oil Company, Conoco, purchased the assets of American Agricultural Chemical Co., and is a successor in interest as Lessor to the Lease Agreement dated October 20, 1953, between Koppers and American Agricultural Chemical Company, pertaining to the four acre site, which is part of the plaintiffs' property.[3]

3. In 1960, Koppers purchased one acre of the four acres which had been leased from Conoco.

4. The Lease was in full force and effect from 1953 through 1968.

5. Conoco sent a letter to Beazer dated July 10, 1992, demanding that Beazer indemnify, hold harmless and defend Conoco from the plaintiffs' claims.

6. Beazer has denied any such obligations.

7. From 1963 to 1972, with the exception of the one acre of the leased premises which was purchased by Koppers in 1960, Conoco owned the property now owned by Ashley Realty Co., referred to as the Dent tract in this case.

8. From 1972 to 1978, Agrico owned the property now owned by Ashley Realty Co., referred to as the Dent tract in this case.

9. By the end of May, 1993, Conoco and Agrico had agreed to settle all of the plaintiffs' claims against Conoco and Agrico, including the plaintiffs' common law claims, which this court had already ruled could not be maintained against Conoco and Agrico. (Jury Tr. Excerpt p. 3, l. 17 through p. 4, l. 23, September 27, 1993).

10. Conoco and Beazer stipulate that if the court determines that a portion of the legal services are attributable to the defense of Dent's common law actions, such as fraud, and are not recoverable, the amount to be set aside by the court as non-recoverable is $50,527.95. (Cercla Tr. Excerpt p.10, l. 5 through p. 11, l. 17, December 15, 1993).

## III. FINDINGS OF FACT

In 1985, investigation of the property associated with Koppers' former wood treating operation revealed that this site posed a high degree of risk to public health and the environment due to contamination from chemical constituents used in wood treatment. The

---

**3.** While this statement was totally correct at the time of the stipulation, Dent's settlement with Beazer during the trial provides that the property has been, or soon will be, transferred from Dent to Beazer or to Beazer's designee. (Cercla Tr., Vol. II, p. 344, ls. 2–12).

determination of the issues in this case is largely dependent upon an understanding of the nature and scope of the Koppers operation, including its effect, not only upon the Koppers property, but also upon the neighboring property, including the Dent property, and its effect on the natural resources in the area.

## A. THE REMEDIATION IS DRIVEN BY KOPPERS' WOOD TREATING CHEMICAL CONSTITUENTS

For nearly 50 years, Koppers was the sole user of wood treating chemical constituents in this area. Koppers' method of disposal of its waste was environmentally unsound, and resulted in massive subsurface contamination of the property to its south (the Dent property) as well as waters of the adjoining Ashley River. The driving force behind the present remediation of the Dent property is the presence of chemical constituents from wood treatment. Based upon documentary evidence, expert testimony established that an estimated five (5) to seven (7) million gallons of creosote have been released into the environment as a result of Koppers' wood treatment practices.[4] (Cercla Tr. Vol. II, p. 122, l. 25 through p. 123, ls. 1–2; Conoco Ex. 127B).

The polynuclear aromatic hydrocarbons (PAHs) detected on the Dent property are associated with creosote, based upon fingerprinting analysis and odor. (Jury Tr. Vol. V, p. 702, l. 7 through p. 703, l. 7; Conoco Exs. 32 and 37). The characteristic creosote fingerprint is present in most of the samples collected at the site. (Jury Tr. Vol. V, p. 733, ls. 12–14). When phenanthrene, fluoranthene, and pyrene are present in samples at concentrations representing one-third of the PAHs present, it is considered definitive for the presence of creosote. (Jury Tr. Vol. V, p. 734, l. 24 through p. 735, l. 3). The distribution of the PAHs here is strongly indicative of creosote. (Jury Tr. Vol. I, p. 177, l. 21 through p. 178, l. 1). The Constituent of Concern (COC) which drives this cleanup is a

wood treating chemical constituent called benzo(a)pyrene. (Jury Tr. Vol. V, p. 741, ls. 6–13). Benzo(a)pyrene, a PAH found in creosote (Conoco Ex. 37), is classified as a class B2 carcinogen (a substance that may cause cancer in animals).

## B. THE DENT PROPERTY IS CONTAMINATED BY PASSIVE MIGRATION OF CREOSOTE FROM KOPPERS' WOOD TREATING OPERATION

There are three possible ways by which creosote could have reached the Dent property, namely dumping, surface water flow, and subsurface migration. (Jury Tr. Vol. V, p. 712, ls. 20–25). Evidence did not indicate that Koppers placed creosote or other wood treating chemical constituent waste directly on the Dent property, thereby excluding dumping as a cause of this contamination.[5] (Jury Tr. Vol. V, p. 764, l. 8 through p. 765, l. 1).

Surface water flow drained naturally from the eastern to the western part of the Koppers property until ditches were constructed to drain the water elsewhere. (Jury Tr. Vol. V, p. 689, ls. 5–9; Conoco Ex. 1). Moving westerly toward the Ashley River the slope of the land decreases in elevation from approximately 12 feet to 3 feet. (Jury Tr. Vol. V, p. 691, ls. 5–8; Conoco Ex. 35). The ground water flow follows the decreasing elevation of the property toward the west to the Ashley River or toward the marshy areas on the Dent property. (Jury Tr. V, p. 691, l. 15 through p. 692, l. 1). The subsurface groundwater flow would have cut through the old impoundment. (Jury Tr. V, p. 693, ls. 18–25; Conoco Ex. 36B Cross-section location map showing subsurface groundwater flow). The marsh line in 1926 ran near the old impoundment in a north-south direction. (Jury Tr. Vol. V, p. 694, l. 13 through p. 695, l. 1; Conoco Ex. 38—1926 survey). Expert testimony established that the most probable pathway to the Dent property was through

---

**4.** This estimate is exclusive of the wood treating chemicals, pentachlorophenol (PCP) and chromated copper arsenate (CCA), also released into the environment during the course of Koppers' operations at the site.

**5.** Beazer acknowledged that there is no first hand testimony that creosote wastes were dumped on the Dent property. (Jury Tr. Vol. III, p. 324, ls. 5–10 and p. 327, ls. 4–5).

subsurface movement as demonstrated by the large amount of creosote in the fill area and in the old impoundment area. (Jury Tr. Vol. V, p. 713, ls. 5–7).

Dense non-aqueous phase liquids (DNAPL) from creosote have migrated underground from the former drainage ditch on the Koppers property to the current drainage ditch south of Braswell Street and to the subsurface of the former impoundment area. (Jury Tr. Vol. V, p. 699, l. 22 through p. 700, l. 5; Conoco Exs. 36D and 36E). The old wooden flume ditch originating at the Koppers separating tanks was located north of and adjacent to the current drainage ditch south of Braswell Street. (Jury Tr. Vol. V, p. 701, ls. 7–25).

## C. THE KOPPERS WOOD TREATING OPERATION

For Koppers' wood treating process, creosote was stored in tanks, then moved to working tanks, and pumped into and out of treatment cylinders.[6] The storage tanks were located on the northeastern portion of the property. The tank farm consisted of a containment dike and six above-ground tanks for creosote storage. Numerous above-ground working tanks were located on an elevated platform in the southeastern portion of the property. The treatment process required stripping bark from logs, primarily for telephone poles and cross-ties, and transporting the stripped timber by rail to the treatment cylinders. (Jury Tr. Vol. V, p. 683, l. 21 through p. 684, ls. 11–17). The treatment cylinders were located in the southeastern corner of the property and were approximately 8 feet in diameter and 133 feet in length. In 1940, Koppers had two treatment cylinders in use. In 1948, a third was added, and a fourth was added in 1952. There was an additional cylinder for a period of time, but it was shipped to another location. (Jury Tr. Vol. V, p. 786, ls. 2–8). One cylinder was dedicated to treatment with the chemicals pentachlorophenol (PCP) and chromated copper arsenate (CCA); three cylin-

ders were exclusively dedicated to creosote treatment.

### 1. Koppers' Disposal System

Inside the cylinders, creosote was injected into the wood until it was saturated; the remaining creosote was pumped back to the storage tanks. A locomotive would then pull the creosote treated wood out of the cylinder to the drip track area located along the southeastern portion of the property. The drippings were collected in a "sump pit" (also referred to as a "collection basin").

A creosote and water effluent was created from the creosote injection process which was released into a drain and then pumped into separation tanks (also located at the southeastern corner of the property), where the creosote would settle to the bottom while the water remained at the top. The creosote was drawn from the bottom of the settling tanks and pumped to a dehydrator, where it was heated to reduce the moisture content. The creosote was then pumped back into the working tanks. Any waste effluent left from the recycling process went into the ditch on Koppers' property that ran along the south side of the property parallel to Braswell Street, and ultimately discharged into the Ashley River. (Jury Tr. Vol. V, p. 787, ls. 20–25).[7]

The conclusion that the source of contamination on the Dent property is massive subsurface migration from the Koppers property is inescapable from the history and topography of the property and is consistent with the weight of the expert testimony and documentary evidence submitted in this case. Koppers' method of creosote disposal is important in the court's approach to assessing liability.

### 2. Koppers' Ditches

A vital element in reaching the conclusion that any contamination problem during Conoco's or Agrico's ownership resulted from

---

**6.** A mixture of PCP and oil, as well as CCA, were also used at the site in the treatment process.

**7.** See also Fisher 1963 trip report demonstrating Koppers' knowledge of the inefficient effluent handling conditions at the site. (Jury Tr. Vol. V, p. 805, l. 9 through p. 806, l. 24; Cercla Tr. Vol. II, p. 184, ls. 4–12; Plaintiff's Ex. 38).

massive subsurface migration, as opposed to active dumping, is the construction and configuration of the drainage ditches on the Koppers property.[8] For practically all of its nearly 50 years of operation, Koppers' major method of disposal for its industrial waste was a series of ditches that ran on its property to the Ashley River. One drainage ditch ran along the southern end of Braswell street from the settling tanks to the middle of the Koppers property. From there, the ditch turned northward to join a central ditch which diverted the effluent and carried it westward down to the Ashley River. (Jury Tr. Vol. III, p. 357, ls. 7–12; Jury Tr. Vol. VI, p. 790, ls. 2–7).[9] The central ditch was the largest (approximately three feet wide and four feet deep) and it extended all the way to the Ashley River carrying effluent from another ditch which ran down the middle of the property. (Jury Tr. Vol. V, p. 790, l. 19 through p. 791, l. 1). Storm water was also discharged through these ditches as well as through a third ditch which was located at the northern edge of the property. (Jury Tr. Vol. V, p. 791, ls. 2–9). A considerable amount of creosote was deposited along the length of the southern ditch. (Plaintiff's Ex. 38—June 21, 1963 Memorandum from Fisher). Creosote contaminated residue in the ditches was shoveled out and placed on a roadbed on the Koppers property. (Jury Tr. Vol. III, p. 360, l. 25 through p. 361, l. 7; Jury Tr. Vol. V, p. 797, ls. 4–8). Koppers' long-time plant manager testified that no open or surface drainage occurred from the southern ditch of the Beazer property to the Dent property from 1945 to 1978. (Jury Tr. Vol. V, p. 791, ls. 19–24).

### 3. *Settling Tanks Undersized*

Undersized settling tanks used in the operation could not handle the rate of flow of the waste waters being pumped into them. This resulted in the overflow of considerable amounts of creosote which eventually entered the open ditch system along the southern edge of the property, thereby contributing to the amounts of creosote that migrated sub-

surface to the Dent property. (Jury Tr. Vol. III, p. 359, ls. 6–21). When Koppers added additional treatment cylinders between 1948 and 1952, the existing settling tanks were unable to hold the waste water generated, and Koppers failed to upgrade its existing separation tank system for treating its effluent waste. Consequently, creosote was not properly recaptured, and was instead released into the environment. Koppers knew, at least by 1963, that the undersized tank problem allowed more effluent to flow in the ditch. (Jury Tr. Vol. III, p. 359, ls. 9–12; Plaintiff's Ex. 38—June 28, 1963 Memorandum from Fisher). In 1962, the South Carolina Water Pollution Control Authority requested Koppers to "proceed with renovation of (Koppers) creosote recovery equipment." (Jury Tr. Vol. V, p. 813, ls. 4–15; Conoco Ex. 4.2—letter July 10, 1962 to Koppers from Rhame). Three years later, this agency was still requesting that Koppers advise it as to what pollution controls and plans had been formulated; thus, the existence of these problems, and their adverse effect on the environment, were well known to Koppers. (Jury Tr. Vol. V, p. 814, ls. 12–23; Conoco Ex. 4.6). The time frame is significant because many of these problems occurred after the ditches along the southern edge of the property closest to the Dent property had been diverted to the center of the Koppers property.

The evidence is persuasive that the overflow of creosote from the undersized settling tanks contributed to the volume of creosote on the Koppers property, which resulted in the subsurface migration that contaminated the Dent property.

### 4. *Cylinders Cleaned With Fire Hoses*

Koppers' unsound cleaning practices added to the amount of wood treating chemicals on its property which later migrated underground to the Dent property. The PCP and CCA treating cylinder was cleaned with a large volume of water from a fire hose. (Jury Tr. Vol. V, p. 879, l. 16 through p. 880, l. 4; Conoco Ex. 146). This water, together

---

8. All of the ditches were on the Koppers property. (Jury Tr. Vol. V, p. 854, ls. 13–25).

9. The diversion of the ditch occurred sometime prior to 1945. (Jury Tr. Vol. III, p. 354, l. 23 through p. 355, l. 2).

with drainage from the pumps, pipes and the process area, entered the sump under the cylinders and was pumped periodically to five separating tanks, where some of the water would overflow and drain through the southern ditch. (Jury Tr. Vol. V., p. 879, l. 22 through p. 880, l. 6; Conoco Ex. 146). The loss of a considerable amount of wood treating chemicals to the environment is well documented. (Plaintiff's Ex. 38—June 28, 1963 Memorandum from Fisher).

#### 5. Cylinder Sludge Disposal

For many years, Koppers' disposal practice was to remove the creosote sludge from the treatment cylinders and dump it as fill on the northwestern end of its property by the rail track. (Jury Tr. Vol. III, p. 372, l. 8 through p. 373, l. 8). Logs, sawdust and creosote sludge created a very porous fill area and allowed subsurface migration of the chemical constituents in the direction of the Dent property. (Jury Tr. Vol. V, p. 711, l. 21 through p. 712, l. 1). At no time was this disposal practice disclosed to any regulatory agency or were any permits requested. Wayne Fanning, a chemist from the South Carolina Department of Health and Environmental Control (DHEC), testified that the disposal of organic or inorganic material by Koppers without a permit violated the 1950 Water Pollution Control Act as well as the 1975 version of that Act. (Jury Tr. Vol. IV, p. 441, ls. 20–25; p. 442, l. 20 through p. 443, l. 6). There was expert testimony (using Koppers' documents) that sludge disposed of on the Koppers property would have been the equivalent of thirty (30) truck loads per month until improvements were implemented and, thereafter, nine (9) truck loads per month. (Cercla Tr. Vol. II, p. 177, ls. 17–25). It is obvious that a large amount of creosote sludge was buried by Koppers on site over the years of its operation.

#### 6. Dehydrator Malfunction

In 1961, Koppers knew that creosote was also being lost into a ditch because its dehydrator was not working, and, as a result, Koppers could not give "good effluent in terms of good stream pollution prevention." (Jury Tr. Vol. III, p. 382, ls. 19–24; Conoco

Ex. 116). Koppers waited until such time as this practice actually became illegal before it dealt with this overflow of creosote to the ditch.

#### 7. Other Creosote Uses by Koppers

Koppers' extensive use of creosote on site is best exemplified by its practice of regularly spraying creosote over its entire plant site as a weed control measure. (Jury Tr. Vol. III, p. 359, ls. 22–24).

#### D. CREOSOTE CONTAMINATION OF ASHLEY RIVER

During December 1987, the South Carolina Wildlife and Marine Resources Department (SCWMRD) detected a significant odor of creosote from various samples collected in the Ashley River. Animals captured in nets were inedible because of contamination from mud laden with creosote. SCWMRD collected data from 1984 through 1986 which revealed the presence of PAHs in blue crabs and oysters within a 15 mile migratory pathway from the site. A DHEC document entitled "Special Organic Chemical Sampling of Charleston Harbor Sediment and Tissue" dated December, 1989, indicated the presence of PAHs in the Ashley River sediments downstream from the Koppers property.

The most dramatic evidence of contamination from the site, and that which most focused attention on the Koppers' plant, was a series of fish kills from 1963 to 1968. (Jury Tr. Vol. V, p. 874, ls. 19–21). There was a documented fish kill on or around July 7, 1967. Internal correspondence indicates that Koppers both resented the publicity about this fish kill and denied responsibility for the problem. (Jury Tr. Vol. III, p. 410, ls. 5–17; Jury Tr. Vol. V, p. 859, ls. 1–13; Conoco Ex. 131). Almost two years later, however, in February 1969, records indicate that Koppers knew that the plant outfall was very high in pollutant properties, i.e., phenol values exceeded thirty (30) times the allowable limit, and high levels of oil and PCP were present. (Jury Tr. Vol. III, p. 408, l. 20 through p. 409, l. 1).

Another fish kill occurred on July 6, 1969. (Jury Tr. Vol III, p. 406, ls. 6–15; Plaintiff's Ex. 228), and still another fish kill occurred

in 1984, when George Dent attempted to dredge his barge slip (with a permit). Mr. Fanning, the state investigator, described dead fish that were covered with a sheen of oil which smelled like creosote.

Promised improvements from Koppers were slow in coming. (Jury Tr. Vol. V, p. 814, ls. 12–23; Conoco Exs. 4.6 and 18.3— report by Talon dated October 10, 1967—; Jury Tr. Vol. V, p. 815, ls. 4–25; Conoco Ex. 111—interoffice memorandum in 1968 from Fisher regarding effluent handling suggestions for wood preserving plants). Waste handling improvements promised following the 1967 fish kill included: a closed circuit steaming system whereby Koppers would steam the wood and take it back to a tank instead of venting the water or condensation out of the bottom of the cylinders (Jury Tr. Vol. V., p. 857); shavings placed as a filter in the ditch; discontinuation of spraying creosote to kill weeds; and connecting the discharge into the North Charleston sewer district line. It was not until 1972, however, that Koppers effectuated a connection with the North Charleston City Sewer System. One of the problems that caused this delay was the fact that Koppers' effluent had to be upgraded before it would be accepted into the North Charleston City Sewage line. (Jury Tr. Vol. III,–. 386, ls. 10–13). For example, as of July 25, 1968, Koppers' effluent was ten times worse than the general sewage. (Jury Tr. Vol. III, p. 393, ls. 1–4; Conoco Ex. 129).

### E. CONOCO/BEAZER LEASE

The American Agricultural Chemical Company (AACC) operated a fertilizer plant adjacent to Koppers' wood treatment facility.[10] On October 20, 1953, AACC, Conoco's predecessor in title, entered into a lease with Koppers, whereby Koppers leased four acres of AACC's west end property located close to the Ashley River and adjacent to, and just south of, Koppers' plant. (Plaintiff's Ex. 1.—Lease). Conoco is a successor in interest as lessor to the Lease between Koppers and AACC. The property leased to Koppers was part of the property later purchased by Dent.

In summary, the above-mentioned Lease provided that: Koppers was only permitted to dispose of clean fill material consisting of wood chips, bark, sawdust and similar materials on the leased premises (Plaintiff's Ex. 1—Lease—p. 2, ¶ 3); Koppers would save Conoco harmless from any and all claims arising from Koppers use of the leased property. (Plaintiff's Ex. 1—Lease—p. 3, ¶ 8); and Koppers would not subject Conoco to liability (Lease p. 3, ¶ 8). Koppers leased the property from 1953 through 1968, at which time the Lease expired. Conoco acquired the property and the rights under the Lease in 1963. Prior thereto, in 1960, Koppers purchased one of the four leased acres. Koppers did in fact place fill material on the leased property, such as bark, ends of poles and whatever debris was generated in the stripping operation, all of which were untreated. (Jury Tr. Vol. V, p. 794, ls. 1–4; p. 799, ls. 15–21). Fill materials, including brick rubble, were deposited by Koppers in the leased area near the pole yard office and pole peeler. (Jury Tr. Vol. V, p. 853, ls. 3–13). No treating cylinder residue was deposited on the leased premises. (Jury Tr. Vol. V, p. 852, ls. 17–19; p. 853, ls. 14–16).

Koppers and Conoco agree that no material was dumped on the Dent property other than the clean fill material in the leased area. (Jury Tr. Vol. III, p. 367, l. 2 through p. 368, l. 5). The "lighter slip" area which was on Koppers' property was already filled in by the time the deposit of the clean fill commenced on the leased property in 1953. (Jury Tr. Vol. III, p. 370, ls. 1–7; Conoco Ex. 3.4). In October, 1977, wood treatment activities on the Koppers property ceased.[11]

### F. BRASWELL'S PURCHASE & SUBDIVISION OF THE KOPPERS' PROPERTY

In October, 1977, real estate agent Dan Batten was retained by Koppers Real Estate

10. The assets of AACC were sold to Fos–Kem Liquidation Corporation (subsequently renamed American. Agricultural Chemical Company) which was a 1963 incorporated subsidiary of Continental Oil Company. This subsidiary subsequently merged with Continental Oil Company, which later became Conoco. All references to Conoco include these post–1963 entities.

11. The jury found that Conoco was sued *solely* as a result of Koppers' use of the leased property.

Department representative Thomas Bourne to market the Koppers property. Subsequently, an offer was submitted by Elliot Braswell. (Jury Tr. Vol. III, p. 344, ls. 21–22). At the time of the sale, Koppers knew about the creosote contamination of the property and the potential that the creosote would need to be removed in order for the property to be usable. (Jury Tr. Vol. 1, p. 201, ls. 7–10; Plaintiff's Ex. 65). The Braswell offer was accepted by Koppers and in 1978 the property was sold to Braswell. Between 1978 and 1982, Braswell subdivided the property and sold all the parcels except parcels 019 and 035 (Tax Map Numbers). Since 1978, Braswell has operated a commercial and military ship cleaning, repair and refurbishing business on parcels 019, 035, 043 and 049.

FedServ Industries, Inc. ("FedServ") leased the creosote storage tanks (parcel—032) left by Koppers after it sold the property. (Jury Tr. Vol. IV, p. 446, ls. 3–9). FedServ used the tanks as a tank farm. (Jury Tr. Vol. VI, p. 945, ls. 14–17). The tanks were later abandoned and, in 1985, DHEC and EPA hired a contractor under the Superfund emergency remedial action program to clean wastes from the tanks and begin the process of removing the tanks. (Jury Tr. Vol. IV, p. 446, l. 25 through p. 447, l. 2). After EPA issued its administrative order, Koppers assumed control of the cleanup under the supervision of DHEC and EPA. (Jury Tr. Vol. VI, p. 945, ls. 20–23). As remediation efforts were underway, a backhoe encountered a black viscous liquid at about four (4) or five (5) feet of soil depth which smelled like creosote. (Jury Tr. Vol. IV, p. 448, ls. 18–22). State officials determined that this material was not spill from the tank and that this deeper contamination could not be addressed under the emergency action; rather, a determination was made that the contamination of the entire site needed to be addressed. (Jury Tr. Vol. IV, p. 449, ls. 9–13). The contaminated soil and tanks from the tank farm were removed. (Jury Tr. Vol. IV, p. 447, l. 24 through p. 448, l. 6). The tanks contained a top layer of used oil and solvent, a layer of waste water, and below that level several feet of sandy sludge

that contained creosote. (Jury Tr. Vol. IV, p. 449, ls. 18–23).

Peppers Industries also leased parcel—044 (the location of the Koppers wood treatment building) from 1978 to 1982, using the creosote working tanks from the Koppers plant as part of a tank and boiler cleaning operation. Under an Administrative Consent Order issued by DHEC in August, 1983, Pepper Industries began a cleanup operation in the storage tank area, but later it declared bankruptcy prior to completing this cleanup. Braswell Shipyards cleaned these tanks, dismantled them, and completed cleanup of this parcel in January, 1987. (Jury Tr. Vol. IV, p. 453, ls. 15–16). Braswell later recovered 50% of the costs incurred in this cleanup from Beazer. These tanks contained both creosote sludge and other wastes added to the tanks by Pepper Industries. (Jury Tr. Vol. IV, p. 453, ls. 13–15). A Site Screening Inspection was performed by DHEC, on October 9, 1987, of the old Koppers work tanks (parcel—044) and DHEC recommended that the site be reevaluated in the future using the EPA Hazard Ranking System (HRS).

## G. THE DENT PROPERTY

The Dent property, which is immediately south of the former Koppers property, was originally the location of Ashepoo Phosphate Works. In 1921, the Dent property was transferred to the American Agricultural Chemical Co. of Connecticut, and later, in 1963, transferred to Continental Oil Company (currently known as Conoco, Inc.), and subsequently to Agrico Chemical Company. Agrico owned the property from 1972 until 1978, but fertilizer manufacturing operations ceased in mid–1975. In 1978, Agrico sold the property to Callowness Polymer Specialty Company. In 1981, Braswell purchased the Dent property from Callowness, and in 1983 and 1986, Braswell sold it in two separate transaction (parcels –012 and –029 respectively) to Dent. Under Dent's ownership these two parcels were operated by Southern Dredging. In 1989, these parcels were later transferred to Ashley Realty Company, another company which was wholly owned by Dent.

At the time Dent purchased the original property, he had no information that creosote contaminants were buried on the property. (Jury Tr. Excerpt, p. 11, ls. 16–22, September 27, 1993). Dent inspected the property, but he did not observe creosote on the ground. (Jury Tr. Excerpt, p. 11, ls. 4–8, September 27, 1993). Later, in 1986, Dent purchased an additional eight acres from Braswell. (Conoco Ex. 2). After Dent purchased the property, the old impoundment area was filled. (Jury Tr. Excerpt, p. 62, ls. 4–8, September 27, 1993).

In November, 1984, Dent began dredging the old barge slip, which had silted-in over a period of years, into the bank on the Ashley River. (Jury Tr. Excerpt, p. 16, ls. 15–17, September 27, 1993). Prior to this dredging, Dent received permits from the South Carolina Coastal Council and the U.S. Army Corps of Engineers. (Jury Tr. Excerpt, p. 13, ls. 7–13, September 27, 1993; Plaintiff's Exs. 217 and 218). The Coastal Council permit was issued on August 17, 1983, and the Corps of Engineers permit was issued on December 7, 1983. The dredging began at the Ashley River and proceeded toward land. (Jury Tr. Excerpt, p. 17, ls. 20–21, September 27, 1993). As the dredging proceeded, creosoted lumber, timber and pile butts were unearthed by the dredge. (Jury Tr. Excerpt, p. 19, ls. 8–10, September 27, 1993). An oily sheen appeared on the water and a strong odor of creosote was detected by Dent. (Jury Tr. Excerpt, p. 19, ls. 14–16, September 27, 1993). The dredge material was pumped to a disposal area which was owned by Braswell adjacent to the Dent property. (Jury Tr. Excerpt, p. 20, ls. 12–15, September 27, 1993). Approximately 35,000 cubic yards were dredged by Dent and placed in the spoils area on parcel 29. (Jury Tr. Excerpt, p. 72, l. 24 through p. 73, l. 3, September 27, 1993). This area was "diked in" to contain the material. (Jury Tr. Excerpt, p. 21, ls. 5–8, September 27, 1993). A spillway from a culvert through the dike allowed water to drain out of the disposal area into the marsh area. (Jury Tr. Excerpt, p. 60, ls. 16–18, September 27, 1993).

The dredging into the bank of the Ashley River, which exposed the creosote, timbers and soil, coincided with a fish kill in the Ashley River that was investigated by DHEC, as previously mentioned. (Jury Tr. Vol. IV, p. 429, ls. 4–14). Mr. Fanning of DHEC found a sheen of oily material in the river that smelled like creosote. (Jury Tr. Vol. IV, p. 429, ls. 12–13; Conoco Ex. 12A). The dead fish smelled of creosote. (Jury Tr. Vol. IV, p. 443, ls. 21–23; Conoco Ex. 12A )(December 14, 1984 Fanning Fish Kill Report). Dent agreed to cap the exposed bank with clay. (Jury Tr. Vol. IV, p. 444, ls. 16–20).

A further release from the dredged area occurred in 1987. (Conoco Ex. 138—March 26, 1987, photograph taken by Mr. Fanning showing the side of the barge slip at the Dent property). Southern Dredging was required to take immediate action to contain the release so Dent installed containment booms and absorbent booms for this purpose. (Jury Tr. Vol. IV, pp. 430–431).

In June, 1990, Braswell (in connection with *Braswell Shipyards v. Beazer East, Inc. v. Elliot Braswell,* Civil Action Number 2:89–455–8) retained RMT, Inc., to perform a site investigation on parcels—019 and—049 to determine, among other things, if creosote compounds were present at that site. Creosote constituents were detected in soil samples as well as a groundwater sample taken from various areas of these parcels.

In 1990, Aquaterra, Inc., was retained by Dent to perform additional soil sampling of the Dent property. (Jury Tr. Vol. II, p. 228, l. 20 through p. 232, l. 17). Aquaterra's July 6, 1990, study entitled "Site Assessment Southern Dredging Company, Inc., Charleston, South Carolina", concluded that organic contamination existed at various areas of the Dent property. (Plaintiff's Ex. 69).

The sediment samples from the barge canal and other soil samples taken by Aquaterra revealed the presence of creosote-based contaminants. The samples contained the same family of constituents as creosote, as well as the appearance and odor of creosote (black and oily type substance). (Jury Tr. Vol. II, p. 231, ls. 19 through p. 232, l. 1). Creosote was also found in the impoundment. (Jury Tr. Vol. II, p. 232, ls. 10–13; Plaintiff's

Ex. 69) (Figure 2 is the enlargement of the location of the Aquaterra sampling).

This recitation of facts outlines the history of Koppers' operations and the impact that such operations had upon what has now become the Superfund site. The use and disposal of creosote in tremendous quantities over a long period of years has saturated this site to significant depths and has resulted in migration of the contamination to the adjacent Dent property. The court will hereinafter summarize the relationship of Conoco and Agrico to these two adjacent tracts which comprise the Superfund site, and the operations of each and their impact on the properties and the surrounding environment.

## H. *GOVERNMENT INTERVENTION*

### 1. *EPA Involvement*

CERCLA's priority ranking system requires that a facility be evaluated and scored based upon the groundwater hazards, the soil hazards, and/or the surface water hazards that are found at the site. A hazard ranking score determines whether the site is eligible to be listed on the National Priority List (NPL) pursuant to CERCLA. (Jury Tr. Vol. 1, p. 75, ls. 21–23). If EPA ranks the site with a score greater than 28.5, then the site will be proposed for listing on the NPL. (Jury Tr. Vol. VI, p. 964, ls. 14–19).

Each investigative report of this site reached the same result, namely, that the constituents of concern in the area were wood treating chemicals. In February, 1985, NUS Corporation (NUS) performed a Site Screening Investigation of the Dent property (parcels –012 and –029) in response to the 1984 fish kill in the Ashley River. (Jury Tr. Vol. 1, p. 71, ls. 3–10; Plaintiff's Ex. 74). This study investigated the potential for COC in the area of the barge canal, the dredged spoil disposal area, the on-site impoundment, the adjacent marsh area, and the Ashley River. (Jury Tr. Vol. 1, p. 71, ls. 11–16; Conoco Ex. 10). Priority pollutant metals and volatile organic compounds were detected in the surface water, soil, and sediment samples.

Later, on August 16,1988, NUS conducted a Hazard Ranking System (HRS) Field Test-

ing Project Site Investigation of the former Koppers wood treating site on behalf of EPA (Plaintiff's Ex. 74). The NUS Study encompassed 127 acres, which included properties to the north and south of the Koppers facility. Sediment, surface soil, and subsurface soil samples, as well as surface water and groundwater samples, were collected and analyzed as part of this investigation. (Plaintiff's Ex. 74).

The field sampling investigation was designed to document, identify and characterize the impact of constituents on the surrounding environment and to satisfy the requirement of the HRS Field Testing Project. NUS concluded from their investigation that PAH's had affected the sediments of the sensitive environment (marshlands) and recreational areas along the Ashley River downstream from the site, and that PAHs from the former wood preserving activities were present in all media (soil, sediment, surface water and groundwater). (Plaintiff's Ex. 74). NUS reported that contamination was "readily attributable" to the past wood preserving operations on the Koppers property. (Plaintiff's Ex. 74).

EPA issued its evaluation of the site pursuant to the HRS on August 28, 1991. In this case, the HRS evaluation resulted in a much higher score than the threshold of 28.50. The Koppers site received a score of 50, indicating it posed a relatively high degree of risk to public health and the environment. (Jury Tr. Vol. V, p. 652, ls. 7–17). The HRS score was a result of three exposure routes: soil contamination with direct human exposure potential; groundwater contamination; and proximity to the Ashley River. (Jury Tr. Vol. 1, p. 193, ls. 16–24). Again, the conclusion was reached that the remediation necessary at the site was driven by wood treating chemical constituents from creosote. (Jury Tr, Vol. 1, p. 194, ls. 14–17). On February 7, 1992, based on this high score, EPA proposed to add approximately 102 acres to the NPL, which included the 45–acre Koppers site and 57 acres located adjacent to the Koppers site, including the Dent property. (*See* 57 F.R. 4824—February 7, 1992; Conoco Ex. 66).

On June 26, 1992, EPA sent Beazer a "Special Notice Letter for Remedial Investigation/Feasibility Study" for the Koppers/Treating Plant Superfund Site. This letter notified Beazer of its potential liability pursuant to § 107(a) of CERCLA. Subsequently, on January 14, 1993, Beazer and EPA entered into an Administrative Order of Consent which set forth the Scope of Work and a 705–day schedule for the completion of the Remedial Investigation/Feasibility Study Work Plan (RI/FS or Work Plan). (Conoco Ex. 26 pp. 7–1 through 7–2).

In May, 1993, Beazer's consultant, ENSR Consulting and Engineering (ENSR), drafted the Work Plan for the NPL site, which included a site description, a summary of past land uses and investigations at the site, preliminary identification of remedial action alternatives and of cleanup levels, a field sampling and analysis plan, and a schedule for completion. (Conoco Ex. 26). The Work Plan contemplated a two-phase field sampling and analysis plan for remedial investigation. (Conoco Ex. 26). The Phase I sampling program was designed to include information to characterize the site, to establish background levels of the analyses, and to provide sufficient data to conduct the human health risk assessment.

In June and July, 1993, ENSR commenced the Phase I field activities. The boring and monitor well installation program implemented during Phase I was intended to provide preliminary information regarding regional and local geology and hydrogeology, as well as the nature and extent of select constituents present in on-site and off-site soil and groundwater. The data collected by ENSR confirmed that the site was contaminated with wood treating wastes which required remediation.

### 2. *DHEC's Public Health Assessment*

DHEC generated a Preliminary Public Health Assessment dated January 18 and March 24, 1993. (Conoco Ex. 12.41). The assessment concluded that the site was an "indeterminant public health hazard" based on the preliminary nature of the human exposure data available. DHEC's assessment also identified wood treatment constituents as the source of the public health hazard. (Conoco Ex. 12.41).

The reports submitted regarding the site are totally consistent with the evidence in this record that extensive wood treating waste contaminants are located on the site and that these contaminants make remediation of the site necessary. (Conoco Ex. 12.41). Koppers was the only source of wood treating wastes in this area. The wood treatment chemical contamination of the Koppers and Dent properties is pervasive according to factual reports as well as expert opinions.

One of the factors with which the court must be concerned, and which bears mention in conjunction with governmental involvement, is the attitude of the party or parties found to be responsible for the contamination. The court has evaluated Koppers' practices and policies over the entire length of time Koppers operated the site, weighing Koppers' cooperation and response against what was known generally, and in the scientific community, about the contamination found at the site. Giving Koppers the benefit of the doubt in an evolving period of environmental regulation, this court has concluded that Koppers acted in total disregard of the duty it owed to its neighboring landowners and to the various governmental agencies. This conclusion is similar to the jury's finding in the retrial of *Braswell Shipyards v. Beazer East, Inc. v. Elliot Braswell,* Civil Action Number 2:89–455–8, awarding the plaintiff fourteen (14) million dollars in punitive damages against Beazer.

During the time that the FedServ storage tank problem was being addressed in 1985, EPA and DHEC were concerned with additional and more wide spread contamination at the site. Koppers responded to this concern by promising that it intended, immediately upon conclusion of the tank farm cleanup, to install a groundwater monitoring well to sample and assess the site for other contaminants present. (Jury Tr. Vol. IV, p. 464, ls. 5–13). This was never undertaken. (Jury Tr. Vol. IV, p. 453, l. 24 through p. 454, l. 5). This conduct is consistent with Koppers' reaction in the 1960's and 1970's to its waste

water problems and the reported fish kills previously discussed.

The NUS Corporation generated data indicating that there was creosote moving into the Ashley River from the Koppers site and accumulating in the sediments of the river and in the various organisms, among them being fish and shellfish found in the river. (Jury Tr. Vol. IV, p. 455, l. 18 through p. 456, l. 1; Plaintiff's Ex. 74). In 1990, DHEC commenced enforcement action against Beazer to require it to install a containment boom and absorbent material in the drainage ditches on the property in an effort to stem the flow of creosote from the site into the river. Beazer opposed this action and, as late as June 10, 1991, Beazer contended that site wide cleanup activities should not be conducted by it until other potentially responsible parties had been identified and directed to join in the effort. Only after the EPA consent order was signed in January, 1993, did Beazer install the containment devices in the ditch.

Beazer argues now that it could not earlier remediate the entire property because it did not have authorization to enter on the properties of the other property owners. (Jury Tr. Vol. IV, pp. 478, l. 18 through p. 479, l. 6). While the court agrees that any landowner would want certain notifications and require restrictions on access to its property, Beazer's argument is not persuasive. It had little difficulty obtaining consent of the various land owners once it decided to cooperate with EPA. (Jury Tr. Vol. VI, p. 996, ls. 2–9). Indeed, Beazer admitted that it placed a condition for going forward with site wide investigation (even before it began negotiations with EPA) that all other Potentially Responsible Parties (PRPs) be brought into the site wide evaluation. An ENSR document characterized its understanding of the Beazer corporate philosophy, i.e., be aggressive with EPA because Beazer had many other remediation projects underway. (Jury Tr. Vol. V, p. 842, l. 17 through p. 843, l. 6; Conoco Ex. 148). ENSR is an environmental and engineering consulting firm which Beazer has employed to perform the RI/FS on this Superfund site. This courts view of Beazer's cooperation is similar to that expressed by DHEC's Mr. Fanning, that is to say, Beazer only acted when required to do so.

It appears to this court that passive migration of creosote has substantially contaminated the Ashley River in the past and will continue to contaminate the Koppers and Dent properties until such time as remediation is complete. This court also believes that the needed remediation of the property will be completed only when remediation of the wood treatment constituents has been accomplished because the levels and locations of those constituents are the driving force behind necessary remediation of both properties. Since there is no documentation of visible surface migration, and since Beazer agrees that no direct dumping of contaminants occurred on the Dent property, the court finds that the massive contamination of the Dent property occurred through subsurface migration of creosote and other wood treating chemical constituents which originated from Koppers' wood treating operation.

Finally, as established by expert testimony, Beazer benefitted over the years from its failure to upgrade the effluent waste handling system at its plant, in that it saved approximately $16 million dollars (present value) needed in upgrade costs (Cercla Tr. Vol. II, p. 125, ls. 16–24). Beazer will also realize an economic benefit from remediation of this site since it or its designee will acquire Dent's property as a part of the settlement agreement between the two parties and, thus, it will receive the benefit of the expenditure of response costs on this property. (Cercla Tr. Vol. III, p. 344, ls. 2–12). On the other hand, Conoco and Agrico will not realize any economic benefit from the cleanup of this site because they no longer own any property at this site.

## IV. CONCLUSIONS OF LAW AND SUPPLEMENTAL FINDINGS OF FACT

### A. CONOCO'S CONTRACT CLAIMS

#### 1. The Lease Agreement is Binding on Conoco and Beazer

 Conoco brought an action for breach of contract against Beazer. South

Carolina law governs the validity of the Lease in this case.[12]

■ The indemnity provision is clear and unambiguous. Where the terms of a contract are clear and unambiguous, its construction is for the court.[13] *Rental Uniform Service of Florence, Inc. v. James E. Dudley*, 278 S.C. 674, 301 S.E.2d 142, 143 (1983) citing *Proffitt v. Sitton*, 244 S.C. 206, 136 S.E.2d 257 (1964). In ascertaining the intention of the parties, the court must first look to the language of the contract. *Blakeley v. Rabon*, 266 S.C. 68, 221 S.E.2d 767 (1976). If the language of the contract is clear and capable of legal construction, the language alone determines the force and effect of the instrument. *Superior Auto. Ins. Co. v. Maners*, 261 S.C. 257, 199 S.E.2d 719 (1973).

■ In this case, the Lease indemnity provision provided that the lessee would hold the lessor harmless for any claim made against the lessor arising out of the use of the leased premises. The indemnity was not restricted by the nature or the validity of the claim so long as it arose from use of the leased premises. (Pre–Trial Conference Tr., pp. 61–62, September 21, 1993). The court further holds that the indemnity provision covers the Dent claims against Conoco as well as Beazer's claims against Conoco which arise from Koppers' use of the leased premises. The contract is clear and requires Koppers to hold Conoco harmless from *any and every claim* arising out of the use by Koppers of the demised premises.

**2. CERCLA Does Not Prohibit Private Parties From Allocating Liabilities for CERCLA Violations and the "Save Harmless" Agreement Includes CERCLA.**

Under CERCLA, parties are free to contractually shift the burden for liability for response costs among themselves. 42 U.S.C. § 9607(e)(1) ("Nothing in [CERCLA § 107(e)(1) ] shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under [CERCLA § 107]"). *See also, Channel Master Satellite Systems., Inc. v. JFD Electronics Corp.*, 702 F.Supp. 1229, 1231 (E.D.N.C. 1988). ("[A]greements to indemnify are not eliminated by the strict liability provisions of CERCLA."); *Jones–Hamilton Co. v. Kop–Coat, Inc.*, 750 F.Supp. 1022, 1026, 1027 (N.D.Cal.1990), *rev'd on other grounds; Jones–Hamilton Co. v. Beazer Materials & Serv., Inc.*, 973 F.2d 688 (9th Cir.1992) (CERCLA does not limit "the freedom of private parties to contract amongst themselves").

■ Under CERCLA, private parties remain accountable to the government for the cost of liability, but such parties are free among themselves to contract out of CERCLA liability.

[The] thrust of § 107(e) is that although one may not deny liability for response costs by virtue of an indemnity or hold

12. The law of the situs should be applied to determine whether a conveyance transfers an interest in land and the nature of the interest transferred. *See Leasing Enterprises v. Livingston*, 294 S.C. 204, 363 S.E.2d 410 (Ct.App. 1987), *citing*, Restatement (Second) of Conflicts § 223(1) (1971). "In contract actions, South Carolina courts apply the substantive law of the place where the contract at issue was formed. See, e.g., *O'Briant v. Daniel Constr. Co.*, 279 S.C. 254, 305 S.E.2d 241, 243 (1983). This rule applies where a contract's formation, interpretation or validity is at issue. However, where performance is at issue, the law of the place of performance governs. *Livingston v. Atlantic Coast Line R.R. Co.*, 176 S.C. 385, 180 S.E. 343, 345 (1935)." *Witt v. American Trucking Associations*, 860 F.Supp. 295, 300 (D.S.C.1994). *Danella Southwest, Inc. v. Southwestern Bell Tel. Co.*, 775 F.Supp. 1227, 1241 (E.D.Mo.1991), *aff'd*, 978 F.2d 1263, 1992 WL 323498 (8th Cir.1992) (the

court determined that the indemnification clause was enforceable in a CERCLA private party suit, and then applied Missouri law to determine the scope of liability under the indemnity clause).

Here there are no questions concerning the execution or validity of this lease. The parties stipulated that Conoco is the successor in interest as lessor to the lease agreement dated October 20, 1953, between the American Agricultural Chemical Company and Koppers.

The lease does not include a choice of law provision; therefore, since the contract relates to land in South Carolina, the laws of South Carolina govern.

13. Beazer's counsel stipulated that the interpretation of the indemnification provision in the lease agreement would be made by this court. (Pre–Trial Conference Tr. pp. 23–25, September 21, 1993).

harmless agreement, *such agreements to indemnify are not eliminated by the strict liability provisions of CERCLA.* (Emphasis added).

*Channel Master Satellite Sys., Inc. v. JFD Electronics Corp.,* 702 F.Supp. 1229 (E.D.N.C.1988) (emphasis added); *See also, Jones–Hamilton Co. v. Kop–Coat, Inc.,* 750 F.Supp. 1022, 1026, 1027 (N.D.Cal.1990), *rev'd on other grounds, Jones–Hamilton Co. v. Beazer Materials & Serv., Inc.,* 973 F.2d 688 (9th Cir.1992), following, *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454 (9th Cir.1986) (CERCLA does not limit "the freedom of private parties to contract amongst themselves.").

■ In *Jones–Hamilton,* the court noted that CERCLA does not require more specific language in an agreement to indemnify against CERCLA liability than that which would be required under state law. *Jones–Hamilton,* 750 F.Supp. at 1027–28. Specifically, that court held that an indemnification agreement which encompassed "all losses, damages and costs" resulting from any violation of law was sufficient to release the indemnitee from CERCLA liability even though the agreement did not specifically mention CERCLA. *Id.* In *Jones–Hamilton,* the indemnity agreement was executed ten years before enactment of CERCLA, yet held to be effective under CERCLA. *Jones–Hamilton* makes it clear that indemnity agreements executed years prior to the enactment of CERCLA are sufficient to encompass indemnity for liability under CERCLA. In *Jones–Hamilton Co. v. Beazer Materials & Serv., Inc.,* 973 F.2d 688 (9th Cir.1992), the Ninth Circuit Court of Appeals reversed the district court because material issues of fact existed regarding Beazer's involvement in the disposal of toxic substances; however, the court inferentially upheld the district courts ruling that the indemnity agreement which was enacted prior to CERCLA still encompassed CERCLA liability. A recent Fifth Circuit case directly upholds this principle of law. In *Joslyn Mfg. Co. v. Koppers,* 40 F.3d 750, 754 (5th Cir.1994), the court stated:

> The Seventh Circuit recently recognized that a party may contract to indemnify another for environmental liability even though CERCLA was not in existence at the time of contracting. See *Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co.,* 14 F.3d 321, 327 (7th Cir.1994). The broad language of the indemnification agreements at issue herein evidence a strong intent by the lessee to indemnify L & A for *all* liability arising in connection with the occupancy or use of the land. We hold that the indemnification agreements were intended to cover all forms of liability, including liability under CERCLA and LEQA, even though environmental liability under these statutes was not specifically contemplated at the time of contracting.

The *Jones–Hamilton* indemnification clause is very similar to the Conoco indemnification provision which provides that Conoco is to be held "harmless from any and every claim." (Plaintiff's Ex. 1—Lease p. 3, ¶ 8). As in *Jones–Hamilton,* Conoco's indemnification agreement, though enacted prior to CERCLA, is nonetheless effective under CERCLA.

■ A private party contract which apportions CERCLA liability must contain a provision which allocates risks of this nature to one of the parties. *Rodenbeck v. Marathon Petroleum Co.,* 742 F.Supp. 1448 (N.D.Ind. 1990). The *Rodenbeck* court upheld a contractual provision which provided that one of the parties shall be released "from all claims and obligations of any character or nature whatsoever arising out of or in connection with said agreement" as being sufficient to indemnify against claims arising under CERCLA *vis-a-vis* the other contracting party. *Id.* The Conoco indemnification clause does just that:

> The Lessee agrees that it will not do or permit to be done any act or thing upon said demised premises which shall or may subject the Lessor to any liability or responsibility for injury to any person or persons or to property by reason of any business or operation being carried on upon the demised premises or for any other reason; [Beazer] agrees to save [Conoco] harmless from any and every claim arising out of the use by [Beazer] of the demised premises or the construction or other work done thereon by [Beazer].

(Plaintiff's Ex. 1—Lease p. 3, ¶ 8) (Emphasis added).

As in *Rodenbeck*, this contractual provision is sufficient to effect indemnification from claims arising under CERCLA against Conoco. The court finds that the indemnification clause in the Lease pertains to CERCLA claims and is valid; therefore, Beazer is liable to Conoco under the terms of the agreement for any and all CERCLA claims related to the use by Koppers of this property.

### 3. The Lease Indemnity Provision Covers Conoco's Attorneys' Fees, Expert's Fees and Settlement Costs.

 A contract of indemnity will be construed in accordance with the rules of construction for contracts generally. *Campbell v. Beacon Manufacturing Co.*, 313 S.C. 451, 438 S.E.2d 271, 272 (Ct.App.1993); *Federal Pacific Elec. v. Carolina Production Enterprises*, 298 S.C. 23, 378 S.E.2d 56 (Ct. App.1989), *citing, Longi v. Raymond–Commerce Corp.*, 34 N.J.Super. 593, 113 A.2d 69 (1955). South Carolina follows the modern trend in looking to the principles of equity in construing the right to indemnity. *See Stuck v. Pioneer Logging Machinery, Inc.*, 279 S.C. 22, 301 S.E.2d 552, 553 (1983). According to equitable principles, a right of indemnity exists whenever the relation between the parties is such that either in law or in equity there is an obligation on one party to indemnify the other, as where one person is exposed to liability by the wrongful act of another in which the first party does not join. (*Id., citing,* 41 Am.Jur.2d *Indemnity* § 2; 42 C.J.S. *Indemnity* § 21). Here the parties specifically contracted for Beazer to hold Conoco harmless from any and every claim arising out of the use of the demised premises.[14]

 The court finds that the attorneys' fees, settlement costs, and all other allowable costs incurred by Conoco in this action are recoverable under the indemnity agreement.

As to attorneys' fees, in actions of indemnity, brought where the duty to indemnify is either implied by law or arises under a contract, reasonable attorneys' fees incurred in resisting the claim indemnified against may be recovered as part of the damages and expenses. *Addy v. Bolton*, 257 S.C. 28, 183 S.E.2d 708, 710 (1971), *quoting*, 22 Am.Jur.2d *Damages* § 166.

As to settlement and other allowable costs, in *South Carolina Electric & Gas v. Utilities Construction Co.*, 244 S.C. 79, 135 S.E.2d 613, 614 (1964), the South Carolina Supreme Court was asked to interpret an indemnity provision whereby the contractor agreed to hold SCE & G "harmless from any and all claims for damages ... arising out of or in any way connected with the performance of any work covered by [the] contract." After settling a personal injury claim arising from Utilities' work, SCE & G sought indemnity from Utilities under the contract. The indemnity provision was upheld and Utilities was required to pay settlement costs, attorneys' fees and expenses to SCE & G.

 In order to recover attorneys' fees under an indemnity agreement in South Carolina, the party must show that: 1) it had become involved in a legal dispute either because of a breach of contract by the defendant or because of defendant's tortious conduct; 2) the dispute was with a third party—not the defendant; and 3) the party incurred attorneys' fees connected with that dispute. If the attorneys' fees were incurred as a result of a breach of contract by the defendant, that defendant will be deemed to have contemplated that his breach might cause the other party to seek legal services in the dispute with the third party. *Addy*, 183 S.E.2d at 709–710.

Dent commenced this action against Conoco as a result of Beazer's use of the leased premises. This issue was placed before the jury and it found that Conoco was sued solely because of Beazer's use of the leased premis-

---

14. South Carolina law provides that a right to indemnity may arise by contract, express or implied, or by operation of law as a matter of equity between the parties. *Town of Winnsboro v. Wiedeman–Singleton, Inc.*, 303 S.C. 52, 398 S.E.2d 500, 502 (Ct.App.1990), *aff'd*, 307 S.C. 128, 414 S.E.2d 118 (1992). Although Conoco did not withdraw its supplemental alternative Counterclaim, Conoco did not actively pursue its equitable indemnification claim and no issue on Conoco's equitable indemnity claim was submitted to the jury.

es. (Jury Tr. Vol. VIII, p. 1210, ls. 4–14; p. 1301, ls. 18–20). Although Beazer maintained that Dent's lawsuit included certain allegations that would not be covered by the hold harmless provision, mere allegations in a complaint do not control whether the non-culpable party is entitled to indemnification. *Town of Winnsboro*, 414 S.E.2d at 120–21. The jury found that Conoco was named in this lawsuit solely because of Beazer's use of the leased premises and, thus, Conoco is covered by the indemnity agreement contained in the Lease.

■ The determination of the amount and reasonableness of attorneys' fees remains a question of law for the court. *Federal Deposit Ins. Corp. v. Aroneck*, 643 F.2d 164, 166 (4th Cir.1981) (Fourth Circuit interpreting South Carolina law on award of attorneys' fees.). *See also, Ex Parte Stevens, Stevens & Thomas, P.A.*, 277 S.C. 150, 283 S.E.2d 444 (1981). The court finds that the most appropriate way to determine the reasonableness of attorneys' fees is to do so after a hearing which this court will hereinafter schedule, unless the parties can reach an agreement thereon. In addition, at that hearing, the court will decide any issue that pertains to the reasonableness of settlement costs and other allowable costs associated with this litigation. The parties shall be notified and will be allowed to present briefs and affidavits as to these particular issues.

### B. AGRICO'S EQUITABLE INDEMNITY CLAIM

Dent sued Agrico on December 5, 1989. The Complaint set forth five state law causes of action against Agrico: negligence and negligence per se, ultrahazardous activity, money had and received, indemnity, and fraud. Agrico was forced to litigate with Dent and incur attorneys' fees and costs because of the contamination of the Dent property by Koppers' wood treating operations. Such expenditures of attorneys' fees and costs were a natural and necessary consequence of Koppers' creosote contaminating operations. Agrico did not join in and had no connection with these operations.

■ Under South Carolina law, equitable indemnity allows a party to recover attorneys' fees and costs of defending an action from the party whose wrongful act caused the first party to be sued. *Town of Winnsboro v. Wiedeman–Singleton, Inc.*, 303 S.C. 52, 398 S.E.2d 500, 502 (Ct.App.1990), *aff'd*, 307 S.C. 128, 414 S.E.2d 118 (1992). The right to indemnity is not based on the facts alleged in the pleadings, but rather on the facts in evidence as found by the fact finder. *Otis Elevator v. Hardin Construction Company Group*, 316 S.C. 292, 450 S.E.2d 41, 43 (1994) citing *Griffin v. Van Norman*, 302 S.C. 520, 397 S.E.2d 378, 380 (Ct.App.1990).

Agrico argued at the jury trial that all of Dent's state law claims arose as a result of the contamination from Koppers' plant operations and, as a result, Beazer should equitably indemnify Agrico for attorneys' fees and costs expended in defense and settlement of Dent's lawsuit. (Jury Tr. Vol. IV, p. 620, l. 13; p. 621, ls. 1–19). Beazer agreed that whether equitable indemnity was appropriate turned on the evidence in the case. (Jury Tr. Vol. VII, p. 1108, ls. 14–17; p. 1118, ls. 20–25). Beazer argued that the jury should determine the basis for Dent's complaint in order to resolve Agrico's equitable indemnity claim. (Jury Tr. Vol. VI, p. 1051–1053; Jury Tr. VII, p. 1108, ls. 19–21). The court agreed to submit the following interrogatory to the jury on this claim:

> Do you, the jury, unanimously find that Agrico has proven by the greater weight of the evidence that it was made a party to this suit solely as a result of Beazer East's activities causing creosote contamination on the property herein involved, and not because of Agrico's conduct in failing to notify the plaintiffs of said creosote contamination on said property?

The jury deliberated and responded "yes" to this interrogatory.

In light of the jury verdict, this court finds that Agrico is entitled to attorneys' fees and costs in an amount to be determined at the hearing to be scheduled by this court.[15]

---

15. One of the issues to be determined at the hearing is whether a portion of the legal services

## C. CERCLA

### 1. Basic Principles

■ CERCLA was enacted in 1980 and amended in 1986 by the Superfund Amendments and Reauthorization Act (SARA) to facilitate the prompt cleanup of hazardous waste sites. CERCLA § 104, 42 U.S.C. § 9604, authorizes the President, who has in turn delegated authority under CERCLA to the EPA, to use Superfund money to respond to any threatened or actual release of any hazardous substance that may pose an imminent and substantial public health threat. CERCLA § 107 (42 U.S.C. § 9607) provides for recovery of response costs from all persons responsible for the release of a hazardous substance. CERCLA provides that these actions may be prosecuted by the Government or by private parties. *See* 42 U.S.C. § 9607(a). Response costs must be consistent with the National Contingency Plan (NCP) to be recoverable.[16] The NCP identifies methods for investigating and responding to the environmental and health problems resulting from a release, or threatened release, of hazardous substances. *See* 40 C.F.R. Part 300. The NCP also provides criteria for determining the appropriate extent of response activities. *See Matter of Bell Petroleum Services, Inc.,* 3 F.3d 889 (5th Cir.1993). A cause of action for the recovery of response costs is allowed under CERCLA when four elements are present:

(1) the site in question is a "facility" as defined by CERCLA;[17]

(2) there is a release, or threatened release, of hazardous substances;[18]

(3) the release caused the plaintiff to incur response costs consistent with the National Contingency Plan; and

(4) the defendant falls within the four categories of potentially responsible persons set forth in § 107 of CERCLA.

*Environmental Transport. Systems, Inc. v. ENSCO, Inc.,* 969 F.2d 503 (7th Cir.1992).

"There is no dispute that the Dent property is now a facility," and that there has been a release of hazardous creosote substances on and from the Koppers property which has caused the expenditure of response costs.

The four categories of persons potentially responsible for the response costs are:

(1) the owner and operator of a facility;

(2) any person who *at the time of disposal* of any hazardous substance owned or operated any facility at which hazardous substances were disposed of;

(3) any person who, by contract, agreement, or otherwise, arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances; and

(4) any person who accepts, or accepted, any hazardous substances for transport to disposal or treatment facilities, incineration vessels, or sites selected by such person.

*See* 42 U.S.C. § 9607(a)(1)–(4) (emphasis added).

---

devoted to the fraud claim are inextricably intertwined and therefore recoverable by Conoco and Agrico. If this court determines at the hearing that the fraud claim was not inextricably intertwined and therefore not recoverable, Beazer and Conoco have stipulated that $50,527.95 would be the amount attributable to allegations against Conoco in Dent's non-CERCLA common law claims. The amount attributable to Agrico will have to be determined at the hearing.

**16.** The NCP was promulgated by EPA, as mandated by CERCLA § 105(a), and it is the guide for federal, state, and private party response activities. *See* 42 U.S.C. § 9605(a); 40 C.F.R. Part 300. The NCP identifies methods for investigat-

ing and responding to the environmental and health problems resulting from a release, or threatened release, of hazardous substances. *See* 40 C.F.R. Part 300.

**17.** A "facility" is "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).

**18.** The term "hazardous substance" is defined in the Act as any substance which appears on any one of six statutory lists of substances. *See* 42 U.S.C. § 9601(14). *See also* 40 C.F.R. § 302.4(a).

A party must first fall within one of these categories to incur liability under CERCLA. A potentially liable party may bring an action for contribution pursuant to § 113(f), as well as a declaratory judgment action pursuant to § 113(g), against any other party to determine the liability for the past and future response costs among the parties. The court has herein earlier determined that wood treating chemical waste [19] is the driving force behind the necessary remediation of this Superfund site, and that this creosote contamination came from Koppers. In response to the Dent lawsuit, Beazer attempted to assign joint and several liability to others for damage Beazer caused by its release of wood treating chemical waste into the environment. The basis of Beazer's assertion was that Conoco and Agrico at different times owned the Dent property adjacent to the former wood treating plant, and that the Dent property is now contaminated with wood treating chemical waste. That is the only possible basis for assigning any liability for creosote contamination to Conoco and Agrico. Beazer also argues that Conoco and Agrico technically are potentially responsible parties under CERCLA because there is some evidence in the record that lead was discharged with wastewater effluent from

their fertilizer manufacturing operation.[20] Nevertheless, expert testimony established that response costs will not be incurred from the presence of lead or the presence of any chemical constituents associated with fertilizer operations. (Cercla Tr. Vol. II, pp. 134–135; Conoco Ex. 113.1).

### 2. *Types of Cercla Claims at Issue*

There are three types of CERCLA actions involved in this lawsuit. The first is a CERCLA § 107 action for the recovery of response costs seeking to hold various parties jointly and severally liable for all response costs. The second involves claims for contribution under CERCLA § 113(f) which govern contribution among the parties. The third is a declaratory judgment action pursuant to CERCLA § 113(g) wherein the court is asked to determine the liabilities of the parties for past and future response costs.[21]

### 3. *Joint and Several Liability*

CERCLA does not specifically provide for joint and several liability in a case involving multiple PRP defendants because joint and several liability provisions were deleted from the respective House and Senate

**19.** Hazardous substances associated with wood treating chemicals include: creosote, pentachlorophenol (PCP), benzo(a)pyrene, chromium and compounds, copper and compounds, and arsenic. *See* 40 C.F.R. § 302.4(a), Table 302.4—*List of Hazardous Substances and Reportable Quantities.*

**20.** Data is reported in the Ashley River Pollution Study conducted by the U.S. Department of Health, Education and Welfare in 1965. (Conoco Exs. 113 and 113.1). The investigation was undertaken because of numerous fish kills in the Ashley River between 1961 and 1965. It examined a number of industrial sites in the area including Koppers and American Agricultural Chemical Company.

The report concluded, *inter alia:*

Only one industry, American Agricultural Chemical Co., has effective waste control procedures in operation. All other industries and municipalities contribute untreated wastes to the Ashley River.

It went on to report that water sampling results showed that lead in industrial effluent waste from the American Agricultural Chemical Company plant was 100 parts per billion and lead from Koppers' effluent was 200 parts per billion in two of Koppers' waste effluent streams. (Conoco Ex. 113.1).

These findings are consistent with the expert testimony that lead released from the fertilizer manufacturer operations will not impact response costs at this site and the court so finds.

Beazer's argument relating to lead, however, is based in part on their Exhibit 33. This exhibit appears to be a compilation of data from sampling at the "Agrico Chemical Company" "Charleston Works" with a "collection date" of January 14, 1972, and February 2, 1972. This three page document is from incomplete files in the possession of Defendant Agrico which relate to a time period prior to Agrico's purchase of the fertilizer plant. The exhibit was admitted without corroborating testimony or explanation, and it contains calculations and handwritten notes which are difficult to read. It appears that the forms were prepared by different people and that one or more of the forms may be drafts. There is no record of who prepared the forms, their accuracy, how they were used, the methods employed in sampling, nor the location of samples. Since there is no testimony or other evidence to clarify this exhibit, this court has concluded that it would not be appropriate to make any finding based on this document.

**21.** Conoco and Agrico also sought declaratory relief under 28 U.S.C. §§ 2201 and 2202.

versions of the bill before its enactment. *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 268 (3rd Cir.1992), *reh'g denied* (July 27, 1992) (*Alcan 3rd Cir.*). There are two reported *Alcan* cases dealing with this issue. The first of these cases was decided by the Third Circuit court of Appeals in 1992, and the other was decided by the Second Circuit Court of Appeals in 1993, *United States v. Alcan Aluminum Corp.*, 990 F.2d 711 (2d Cir.1993) (*Alcan 2d Cir.*). In *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 808 (S.D.Ohio 1983), the court determined that the scope of liability and the term "joint and several liability" were deleted "to avoid a mandatory legislative standard application in all situations which might produce inequitable results in some cases." After citing specific Congressional debates, the *Chem–Dyne* court concluded:

> The deletion was not intended as a rejection of joint and several liability. 126 Cong. Rec. S14964, H11787, H11799 (Nov. 24, 1980). Rather, the term was omitted in order to have the scope of liability determined under common law principles, where a court performing case-by-case evaluation of the complex factual scenarios associated with multiple-generator waste sites will assess the propriety of applying joint and several liability on an individual basis.

*Chem–Dyne*, 572 F.Supp. at 808.

The court in *Chem–Dyne* held that imposition of joint and several liability should be determined under the principles set forth in Restatement (Second) of Torts §§ 433A, 881. §§ 433A and 881 of the Restatement provide that when two or more joint tortfeasors acting independently cause a distinct or single harm for which there is a reasonable basis for apportionment of liability according to the contribution of each, each tortfeasor is subject to liability only for the portion of harm that he or she has caused. Restatement (Second) of Torts §§ 433A, 881.

The Fourth Circuit adopted the *Chem–Dyne* CERCLA statutory analysis:

> We adopt the *Chem–Dyne* court's thorough discussion of CERCLA's legislative history with respect to joint and several liability. We note that the approach taken in *Chem–Dyne*, was subsequently con-

firmed as correct by Congress in its consideration of SARA's contribution provisions.

*United States v. Monsanto Co.*, 858 F.2d 160, 171 n. 23, *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). *See also, Chesapeake & Potomac Tel. Co. of Va. v. Peck Iron & Metal Co., Inc.*, 814 F.Supp. 1269, 1278 (E.D.Va.1992) ("In deciding whether liability is joint and several, the court is guided by the test set forth in the Restatement."); O'Neil v. Picillo, 682 F.Supp. 706, 714 (D.R.I.1988), *aff'd,* 883 F.2d 176, (1st Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990), *citing*, Restatement (Second) of Torts §§ 433A, 881 ("if the … injury is divisible, or there is … a reasonable basis for division according to the contribution of each, then liability will be apportioned accordingly."); *United States v. Stringfellow*, 661 F.Supp. 1053, 1060 (C.D.Cal.1987), *citing*, Restatement (Second) of Torts §§ 433A, 875, 881 ("[I]f there are distinct harms that are capable of division, then liability should be apportioned according to the contribution of each defendant").

In determining whether a reasonable basis for division of liability exists, this court is persuaded by the holding of *Matter of Bell Petroleum Services, Inc.*, 3 F.3d 889 (5th Cir.1993). In *Bell Petroleum*, which involved the remediation of a chromium-contaminated underground drinking water source, the Fifth Circuit Court of Appeals held that joint and several liability should only be imposed in exceptional circumstances. The *Bell Petroleum* court noted that the fact that each defendant's contribution to the total harm cannot be proved with absolute certainty is an inadequate ground for refusing to apportion liability: *Id.*

> [T]he question whether there is a reasonable basis for apportionment depends on whether there is sufficient evidence from which the court can determine the amount of harm caused by each defendant. If the expert testimony and other evidence establishes a factual basis for making a reasonable estimate that will fairly apportion liability, joint and several liability should not be imposed in the absence of exceptional circumstances. The fact that apportion-

ment may be difficult, because each defendant's exact contribution cannot be proved to an absolute certainty, or the fact that it will require weighing the evidence and making credibility determinations, are inadequate grounds upon which to impose joint and several liability.

*Id.* at 903. Based on this holding, this court will apportion liability among the parties rather than impose joint and several liability so long as it can, from the evidence, make a "reasonable estimate that will fairly apportion liability."

 The burden of demonstrating a reasonable basis for division of liability is on Conoco and Agrico as the parties seeking individual, as opposed to joint and several, liability. *United States v. Monsanto Co.*, 858 F.2d 160, 172 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Alcan (3rd Cir.)*, 964 F.2d at 269. If a party meets this burden, it should be liable only for that portion of the harm fairly attributable to it. The analysis to be used to determine whether this burden has been met includes the establishment of a relationship between waste volume and the release of hazardous wastes and harm at the site, and relative toxicity, migratory potential, and synergistic capacity. *Id.* at 269.

 This court, in following the rationale of *Monsanto*, *Chem–Dyne*, and *Bell Petroleum*, finds that Conoco and Agrico have met the burden of showing a reasonable basis for division of liability in this action. This court has concluded that while Conoco and Agrico may be potentially responsible parties under CERCLA § 107(a), they should not be held jointly and severally liable for response costs because this court can make a reasonable estimate that will properly apportion liability.

Having found that the cause behind this entire cleanup is the massive release of creosote from the Koppers facility, the court concludes that, based on expert testimony, approximately five (5) million to seven (7) million gallons of creosote alone were released by Koppers over the years. (Cercla Tr. Vol. II, pp. 122–123; Conoco Ex. 127B).

A large portion of these releases may have been prevented if Koppers had implemented more effective waste discharge control measures to counter problems associated with increased effluent volumes and poor performance of existing pollution control equipment as previously discussed. Beazer urges the court to impose liability against Conoco and Agrico for the subsurface migration of its (Koppers') waste to the Dent property.

The court is convinced that the harm caused by Koppers' massive and continued disposal of hazardous substances is clearly distinct from Conoco's and Agrico's mere ownership of property to which the chemicals migrated. In reality, Koppers' releases were the only cause of the harm inflicted on the environment at this site; stated another way, "but for" Koppers there would be no need for remediation. *See Bell Petroleum*, 3 F.3d at 896–903, (Although the rule for apportionment of liability in the Restatement (Second) of Torts applies only to "[a] proved wrongdoer who has in fact caused harm to the plaintiff", the court recognized that CERCLA is a strict liability statute and that "[t]he Restatement principles may be adapted, where necessary, to implement congressional intent with respect to liability under the unique statutory scheme of CERCLA.") *Id.* To extend liability to Conoco and Agrico for any response costs would be improper.

Beazer has attempted to shift the focus of these proceedings from the extensive presence of creosote, CCA, and PCP contamination to the fact that there has been some presence of lead at the site. As discussed earlier, there is some limited evidence which indicated that there were de minimis concentrations of lead in some of American Agricultural Company's discharges in the past; however, there is evidence that this discharge was effectively recaptured (Conoco Exs. 113 and 113.1). Even if Agrico and Conoco are considered "potentially responsible parties" under CERCLA, there is simply no credible evidence in the record to suggest that the presence of lead at this site will impact the cost of past, present, or future remediation efforts.[22] To the contrary, there is evidence

---

22. Beazer attempted to shift the focus from its wood treating "hazardous substances" to lead.

The Ashley River Pollution Study shows that the fertilizer operation had effective waste effluent

that it will not impact the cost of any remediation at this site. Based on the *Bell Petroleum* decision, the *Alcan (3rd Cir.)* decision, *infra,* and the Fourth Circuit Court of Appeals's adherence to the Restatement principles regarding joint and several liability, this court remains convinced, despite the presence of a very limited amount of lead at this site, that Koppers is the *sole* cause of *all* the environmental harm at this site which poses any risk and requires remediation and resulting response costs; therefore, Beazer is apportioned 100% of the liability for all past and future costs.

In *United States v. Alcan Aluminum Corp.,* 964 F.2d 252 (3rd Cir.1992), the Third Circuit Court of Appeals held that a party could escape liability for response costs entirely if it could show that division of liability is appropriate because its hazardous substances, when mixed with other hazardous substances, did not contribute to the response costs. *Alcan (3rd Cir.),* 964 F.2d at 270; *Accord Alcan (2d Cir.),* 990 F.2d at 722. That court also noted that a showing that

division of liability is appropriate would require an assessment of the relative toxicity, migratory potential, and synergistic capacity of the hazardous substances. *Id.* at 269; *Accord United States v. Monsanto,* 858 F.2d 160, 172 & 172 n. 26 (4th Cir.1988), ("We agree ... that evidence disclosing the relative toxicity, migratory potential, and synergistic capacity of ... hazardous substances at the site would be relevant to establishing divisibility of harm"). These issues are evaluated in conducting a risk assessment and in developing a remedial action plan for the site. A risk assessment and remedial action plan was prepared by Conoco's expert witness, Richard Bost, for this site. The analysis for relative toxicity, migratory potential and synergistic capability were considered in the preparation of this analysis.[23] (Cercla Tr. Vol. II, pp. 121–138; Conoco Ex. 48 and 49). After consideration of these issues, the expert testified that hazardous substances related to fertilizer operations will not require remediation or increase the cost of remediation.[24] (Cercla Tr. Vol. II, pp. 100, 109 and

controls. (Conoco Ex. 113.1). Neither the presence of lead nor the presence of any other constituents in any way related to fertilizer operations at this site will have an impact on any past or future response costs. (Cercla Tr. Vol. II, p. 134–137). Thus, for the reasons already discussed, this court concludes that the presence of any "hazardous substances" related in any way to fertilizer operations does not increase the amount of, or require the need to, incur response costs.

23. In regard to "migratory potential," the Dent property adjacent to the Koppers facility has been massively contaminated with creosote originating from the Koppers facility. (Jury Tr. Vol. V, p. 713; Conoco Exs. 1, 34.5, 35, 36b, 36d, 36e). The PAHs detected on the Dent property are associated with creosote based on fingerprint analysis and odor. (Jury Tr. Vol. V, p. 702–704; Conoco Exs. 32 and 37). On the other hand, since there is no evidence that any constituent from the fertilizer operations is present in quantities that pose a risk, there is no migratory risk. (Cercla Tr. Vol. II, p. 137–138). None of the activities at the old fertilizer plant will have any impact on the groundwater of the property. (Cercla Tr. Vol. II, p. 108–109; Conoco Exs. 34.1, 34.4, 34.5).

As to the analysis for "synergistic capacity" (which refers to capacity of combined chemical constituents to cause greater adverse environmental harm), the fertilizer constituents and creosote operating together do not have such

capacity. In fact, the opposite is true in that fertilizer constituents that might be present degrade creosote. (Cercla Tr. Vol. II, p. 118–119; Jury Tr. Vol. VI, p. 984). This means that fertilizer constituents potentially reduce the amount of constituents necessary for bioremediation. (Cercla Tr. Vol. II, p. 118–119; Jury Tr. Vol. VI, p. 984); also, the lead found at the site will not impact the cost of remediation of this site.

As a result of the foregoing, the court finds that the wood treating wastes released by Beazer are highly toxic in contrast with any wastes associated with the fertilizer operations which do not appear to be highly toxic. With regard to the migratory potential of waste requiring remediation and response costs to be incurred, the wood treating wastes have a very significantly higher migratory potential, and, in fact, have migrated well beyond the Koppers property and have contaminated areas far away from the Koppers property, including the Dent property. In contrast, there has been no similar showing for wastes associated with fertilizer operations at the site which will require remediation and the expenditure of response costs. Finally, based on the evidence presented, this court finds that fertilizer constituents will not combine with other wastes at the site to either require remediation or the expenditure of response costs, and, further, will not increase the need for remediation or the amount of response costs to be incurred.

24. Beazer did not conduct a risk assessment or develop a remedial action plan.

pp. 121–127). Thus, *Alcan (3rd Cir.)*, 964 F.2d 252, provides a very clear basis for dividing liability and holding Beazer responsible for 100% of the response costs despite any presence of lead at this site. Most importantly, the expert testimony that the presence of lead or any other fertilizer constituents will not impact response costs squares with the holding in *Alcan (3rd Cir.)* 964 F.2d 252, 258, that a party may escape liability for response costs entirely if its hazardous substances do not have any impact on these costs. Therefore, this court holds, since it has not been demonstrated that lead or other constituents related to the fertilizer operations at this site will have any impact on the remediation of the site, and since a reasonable basis for a division has been demonstrated, it is appropriate to divide liability entirely on the basis of each party's responsibility for the harm caused by the release of wood treating chemicals which necessitated the need to incur response costs. In keeping with this determination, this court grants Conoco's and Agrico's request for declaratory relief and holds that Beazer is liable for 100% of all past and future response costs. CERCLA § 113(g)(2) and §§ 28 U.S.C. 2201 and 2202.

■■■■ Declaratory judgment is a mechanism to allocate CERCLA liability. *See Rockwell Int'l Corp. v. IU Int'l. Corp.*, 702 F.Supp. 1384, 1389 (N.D.Ill.1988) (declaratory judgment will establish that one or more defendants are individually or jointly and severally liable for any response costs incurred). The purpose of the declaratory judgment provision is to allow the parties to understand their rights and liabilities so that they can adjust their future action to avoid unnecessary losses. *Rockwell*, 702 F.Supp. at 1388, *citing, ACandS, Inc. v. Aetna Cas. and Surety Co.*, 666 F.2d 819, 823 (3rd Cir. 1981). *See also, Lyncott Corp. v. Chemical Waste Management, Inc.*, 690 F.Supp. 1409 (E.D.Pa.1988) (third-party defendant in CERCLA action brought separate action for

declaratory relief against plaintiff and the court held that the separate action for declaratory relief was ripe "... because, by reason of the third-party complaints in the CERCLA litigation, plaintiffs –in the second suit– are exposed to the ongoing obligation of defending themselves against the claims of the generators...."). Adjudication of the issues arising out of a request for declaratory relief will not and need not result in any actual calculation or immediate payment of damages. *Rockwell*, 702 F.Supp. at 1389, *citing, Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937).

■■■ Beazer argues that division of liabilities and allocation of response costs are improper because the EPA, which has known about the serious condition of the site since 1988,[25] is still investigating the property. To the contrary, the evidence demonstrates to this court that:

(i) the major part of the investigation of the property, the Remedial Investigation Phase I, is complete;

(ii) a percentage of samples was taken for chemicals *other* than those related to wood treating constituents. (Beazer maintains that allocation is improper because "there are chemicals other than wood treating constituents on the Dent property". This argument is not convincing because evidence regarding risk assessment, remedial/response cost, and cost allocation always takes into consideration *all* substances on the site);[26]

(iii) DHEC requested a more complete analytical sample, but Beazer did not provide such data, which is inconsistent with Beazer's current argument that additional study is now required; and

(iv) the remainder of the sampling is not required in order to perform a risk assessment, a general remediation

---

**25.** The South Carolina authorities have had knowledge of the contamination since as early as 1986.

**26.** Not every hazardous substance presents a risk. Test conducted by experts established

which hazardous substances require the need for expenditure of response costs and fertilizer chemical constituents will not require the expenditure of such costs. (Cercla Tr. Vol. II, p. 134–137; Conoco Ex. 113.1).

plan, a division of liability, or a cost allocation.

This court finds that the division or allocation should not be postponed because of the need for additional investigation.

 Additionally, Beazer's contention that allocation is not proper until the E.P.A. approves the remediation plan, and the money is spent, is contrary to case law. In addition it has the effect of delaying private party cleanups and causes much damage to non-responsible parties. A government approved remediation plan is not a prerequisite for the court's entry of an order of percentage liability allocation. This is true for several reasons. First, § 107 of CERCLA does not include language requiring governmental pre-approval of a remediation program as a prerequisite to bringing this type of action. *See* 42 U.S.C. § 9607. Second, numerous cases expressly hold that private parties may recover investigatory costs and future costs, even if the government has not approved a remediation plan, and remediation has not yet begun. *Rockwell,* 702 F.Supp. at 1387, 1390. *See also, Cadillac Fairview/California, Inc. v. Dow Chemical Co.,* 840 F.2d 691, 694–95 (9th Cir.1988); *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1294 (D.Del.1987), *aff'd,* 851 F.2d 643 (3rd Cir.1988), *reh'g denied* (July 26, 1988) (holding that the accrual of monitoring and evaluation costs are sufficient to state a CERCLA claim even in the absence of any government approved cleanup plan); *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887 (9th Cir.1986); *State of New York v. Shore Realty Corp.,* 648 F.Supp. 255 (E.D.N.Y.1986); and *New York v. Exxon Corp.,* 633 F.Supp. 609 (S.D.N.Y.1986). Third, the purposes of CERCLA are best served by allowing private parties to establish their respective responsibilities through private civil actions without first obtaining government approval. *Rockwell,* 702 F.Supp. at 1387; *O'Neil v. Picillo,* 682 F.Supp. 706, 720 (D.R.I.1988), *aff'd,* 883 F.2d 176 (1st Cir.1989). ("[T]he courts are unanimous that declaratory judgments as to future removal costs are consistent with CERCLA's purpose of encouraging prompt remedial action."); *State ex rel. Brown v. Georgeoff,* 562

F.Supp. 1300, 1316 (N.D.Ohio 1983) (in a case decided prior to the enactment of the CERCLA declaratory judgment provision in which the court concluded that a declaration of liability for response costs would serve CERCLA's purpose of "promptly respond[ing] to the threats posed by hazardous waste dump sites.") The purpose of the declaratory judgment is to allow the parties to understand their rights and liabilities so that they can adjust their future action to avoid unnecessary damages. *Rockwell,* 702 F.Supp. at 1388, *citing, ACandS,* 666 F.2d at 823. The parties, understanding their liability and in what proportions, may then have an incentive to agree upon an effective and cost-efficient plan to remove the contamination before the E.P.A. intervenes through the court. *Rockwell,* 702 F.Supp. at 1390. Those who are not liable, such as Conoco and Agrico, are no longer exposed to litigation costs. *See Lyncott Corp. v. Chemical Waste Management, Inc.,* 690 F.Supp. 1409 (E.D.Pa.1988). *See also, Rockwell,* 702 F.Supp. at 1388, *quoting Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 893 (9th Cir.1986) (the absence of government enforcement actions under CERCLA does not render the controversy between the parties remote and hypothetical).

This court concludes that CERCLA's provision for declaratory relief is particularly appropriate in this case given that: (1) response costs have already been incurred at this site; (2) Beazer has been allocated 100% of the liability for response costs; and (3) future response costs will be incurred at this site. For the reasons heretofore expressed this court holds, as among the parties before the court, Beazer is 100% liable for all past and future response costs incurred at this site.

### 4. *Contribution*

 This court further holds, in the alternative, that even if a higher court later determined that Conoco and Agrico are jointly and severally liable for response costs at this site, that Beazer should still be allocated 100% of such costs based upon a consideration of the equitable factors under the contribution action filed pursuant to CERCLA § 113(f).

In allocating liability for response costs in a contribution action under CERCLA § 113(f)(1), a court is not limited to any specific equitable factors in deciding how to apportion liability, but may consider those factors which are relevant to the circumstances of the case. 42 U.S.C. § 9613(f)(1); *Weyerhaeuser Co. v. Koppers Co., Inc.,* 771 F.Supp. 1420, 1426 (D.Md.1991). A number of equitable factors that have been identified in the legislative history of CERCLA are particularly relevant in most CERCLA contribution actions. *Id.* These factors, known as the *Gore Factors,* are:

(1) The ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished;

(2) The amount of hazardous waste involved;

(3) The toxicity of the hazardous waste involved;

(4) The degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(5) The degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(6) The degree of cooperation by the parties with Federal, State, or local officials to prevent harm to the public health or the environment.

*See United States v. R.W. Meyer, Inc.,* 932 F.2d 568 (6th Cir.1991).

A proper consideration of each one of these, and of other factors, weighs heavily in favor of allocating the entire share of response costs to Beazer. First, responsibility for the massive releases of creosote and other wood treating chemicals on this property can and have been clearly traced to Koppers. Second, neither Conoco nor Agrico had any part in the wood treating operation but they simply owned property next to Koppers. Any hazardous substances which may have allegedly been contributed by Conoco or Agrico are only present in small concentrations. (Cercla Tr. Vol. II, p. 122, ls. 13–15). It has not been demonstrated that their presence at such concentrations will have on impact on remediation efforts at this site, as evidenced by the Ashley River Study report previously discussed, and the fact that expert opinion evidence also indicated that such concentration would not affect the remediation costs. (Cercla Tr. Vol. II, p. 134, l. 10 through p. 135, l. 10; p. 136, l. 20 through p. 137, l. 4). Third, the creosote and other wood treating chemicals are significantly more toxic than any "hazardous substances" which may have allegedly been released by Conoco and Agrico. The constituent of greatest concern at this site is benzo(a)pyrene. (Jury Tr. Vol. V, p. 741, ls. 6–13). Benzo(a)pyrene is a PAH found in creosote (Conoco Ex. 37), and is classified as a class B2 carcinogen.[27] The court has reviewed the record and the testimony related to the carcinogenic potential of other substances as well. Beazer has not proven that any carcinogenic substances were contributed to the site by the fertilizer operations and there is expert testimony that such was not the case. (Cercla Tr. Vol. II, p. 122, ls. 6–15). The only "hazardous substance" for which there is credible evidence suggesting that releases may have come from either Conoco or Agrico is lead. (Conoco Exs. 113 and 113.1). Lead is not classified as a carcinogenic substance.[28] As the court has found, lead is not present at this site in concentrations that will require remediation or the expenditure of response costs. (Cercla Tr. Vol. II, pp. 134–135, 136, l. 20; p. 137, l. 4).

Fourth, the degree of Koppers' involvement in the generation and disposal of hazardous substances is greatly different from that of Conoco and Agrico, and Koppers is solely responsible for hazardous substances which will require remediation.

27. A class B2 carcinogen is a substance which data indicates may cause cancer in animals when exposed. (Jury Tr. Vol. V, p. 832, ls. 10–13). Benzo(a)pyrene is defined as a hazardous substance. (Jury Tr. Vol. V, p. 682, ls. 5–10).

28. Fertilizer constituents are identified as nutrients for human consumption. (Cercla Tr. Vol. I, p. 73, ls. 16–21).

Fifth, Beazer exercised significantly less care than Agrico or Conoco with respect to the releases of hazardous substances. The court has detailed in its numerous findings how inefficient and callous Koppers was in the handling of its wastes. The objective scientific findings from the Ashley River Study revealed that the fertilizer operations were more efficient and protective of the environment. (Conoco Exs. 113 and 113.1). The important and obvious conclusion which must be reached from a comparison of the respective companies is that Conoco and Agrico had no knowledge of, and no control over, Koppers' release of wood treating hazardous substances and the subsequent contamination of the Dent property.

Finally, the record indicates that Beazer consistently failed to cooperate with state officials in dealing with the contamination. The experiences of Mr. Fanning from the state and the representations from the EPA in dealing with Beazer are heretofore set forth herein. On the other hand, the record is devoid of any indication that Conoco or Agrico failed to cooperate with state or local government officials. Accordingly, considering only the *Gore Factors* in allocating liability, the court finds that Beazer should be allocated 100% of the response costs.

The *Gore Factors* are not, however, the only relevant equitable factors to consider in allocating costs. *See Weyerhaeuser,* 771 F.Supp. at 1426 ("[A] court is not limited to any specific equitable factors in deciding how to apportion liability in a contribution action under CERCLA § 113(f)(1)"). Another relevant factor in allocating response costs in this case is the economic benefit associated with the releases of the hazardous substances that each party realized. *See Weyerhaeuser,* 771 F.Supp. at 1427.[29] Koppers enjoyed significant profits during the time that it operated this wood treating facility in such a manner that it became the source of contamination which ultimately "drove" this remediation. Beazer also realized significant economic benefits by failing to implement waste control measures which this court feels would have eliminated a significant portion of the contaminated releases. Evidence based on expert testimony at trial indicated that Beazer saved approximately sixteen (16) million dollars, (present value), by failing to expend funds to implement waste control practices. (Cercla Tr. Vol. II, p. 125, ls. 16–24). Unlike the situation in *Weyerhaeuser,* neither Conoco nor Agrico realized any direct benefits from the operation of the wood treating facility and the release of hazardous wood treating chemical constituents into the environment.[30]

---

**29.** While *Weyerhaeuser* provides precedential support for the proposition that economic benefit can be a factor to be considered in an equitable allocation of damages in a CERCLA § 113(f) contribution action, this court notes that the facts in *Weyerhaeuser* are distinguishable from the facts in this case and provide no support for allocating any damages to either Conoco or Agrico. In *Weyerhaeuser,* the lessee-operator of a wood treatment facility which was the "sole cause of the environmental damage" was allocated the "lion's share" of damages. However, the lease agreement between the lessee-operator and lessor-owner in *Weyerhaeuser* gave rise to what could easily be characterized as a "joint venture" between the two parties. The lessee, specifically covenanted in the lease agreement with the owner of the property, a lumber company, to install certain specific wood treating equipment on the site and to treat lumber products for the lessor. *Weyerhaeuser,* 771 F.Supp. at 1423. Furthermore, the leased premises were "[t]o be used only for the purpose of treating, storing, and handling lumber and other forest products[.]" *Id.* An additional agreement required the facility to treat all lumber and forest products delivered to

it by Weyerhaeuser. *Id.* Obviously, the lessor-owner derived a significant economic benefit from this operation since the wood treatment facility provided the lessor with a convenient location for treatment of its own lumber products. Not only did the lessor-owner not prohibit spills and discharges, but some spills, leaks and other discharges of wood treating chemicals would have to be expected to occur at this facility.

In contrast, Conoco's lease agreement with Koppers specifically prohibited Koppers from dumping any materials on the property which might be contaminated with wood treating chemicals. Furthermore, the contamination of this property resulted from subsurface migration from Koppers' wood treating facility, and not from any lease-related activity. Finally, Conoco, was not involved in the lumber business and so Koppers' activities on the leased property would not have any direct impact on the profitability of the Conoco fertilizer operations.

**30.** Beazer will also realize an economic benefit from remediation of this site since it or its designee will acquire the Dent property as a part of

In addition to being liable to Conoco and Agrico in contribution for 100% of all incurred response costs at this site, this court holds that Beazer is also liable to Conoco and Agrico in contribution for 100% of all future response costs at this site. CERCLA § 113(g)(2); CERCLA § 113(f); *See* 28 U.S.C. § 2201; *Rockwell Int'l Corp. v. IU Int'l Corp.*, 702 F.Supp. 1384,1390 (N.D.Ill. 1988); *Alloy Briquetting Corp. v. Niagara Vest, Inc.*, 756 F.Supp. 713, 718 (W.D.N.Y. 1991).[31]

**IT IS SO ORDERED.**

## V. *APPENDIX*

### A. *STATEMENT OF THE CASE*

On December 5, 1989, H. George Dent, Jr., Ashley Realty Company, Inc., and Southern Dredging Company, Inc. (Dent) filed this action against, *inter alia*, Beazer East, Inc. (Beazer), Continental Oil Company, American Agriculture Chemical Company, Fos-Kem Liquidation Corporation (Conoco), and Agrico Chemical Company (Agrico). On January 2, 1990, Beazer filed its Answers and Counterclaims against Dent for Statutory Response Costs pursuant to 42 U.S.C. § 9607 seeking Declaratory Judgment relief. On January 10, 1990, Dent replied generally denying Beazer's Complaint and Counterclaims and seeking dismissal with prejudice. On March 2, 1991, Beazer filed its Amended and Supplemental Counterclaims against Dent for Response Costs pursuant to 42 U.S.C. § 9607(a), and Contribution pursuant to 42 U.S.C. § 9613(f). On July 8, 1991, Dent answered Beazer's Amended and Supplemental Counterclaims generally denying the allegations with a request that same be dismissed with prejudice.

On March 2, 1991, Beazer filed its Third-Party Complaint against Braswell for Response Costs pursuant to § 107, Contribution pursuant to Section § 113(f), Declaratory Judgment pursuant to § 113(g), Common Law Indemnity, and Common Law Contribution.[32] On July 2, 1991 Braswell answered Beazer's Third-Party Complaint requesting that it be dismissed.

On March 2, 1991, Beazer filed its Amended and Supplemental Counterclaims against Dent for Response Costs pursuant to § 107, Contribution pursuant to § 113(f), and Declaratory Judgment pursuant to § 113(g). On July 8, 1991, Dent answered with a request that same be dismissed.

On January 29, 1990, and March 9, 1990, respectively, Conoco and Agrico served their Answers to the Dent claims.[33] On February 1, 1991, and August 14, 1991, respectively, Conoco and Agrico filed their Counterclaims against Dent for: Statutory Contribution pursuant to 42 U.S.C. § 9613(f)(1); Declaratory Judgment pursuant to 42 U.S.C. § 9613(g)(2); Common Law Indemnity; and Equitable Lien for any increase in value of the property at issue. On July 9, 1991, Dent served its Reply to Conoco's and Agrico's Counterclaims, generally denying the allegations in the Counterclaims. On July 16, 1991, Conoco and Agrico filed their Joint Motion and Supporting Memorandum for Summary Judgment against Dent on the common law causes of action alleging, *inter alia*, the bar of the statute of limitations.

On April 21, 1992, Dent filed its Amended Complaint against Beazer, Conoco and Agrico, which included certain common law claims along with CERCLA claims for Response Costs pursuant to 42 U.S.C. § 9607, Contribution pursuant to 42 U.S.C. § 9613,

---

the settlement agreement between the two parties and will receive the benefit of its expenditure of response costs. (Cercla Tr. Vol. III, p. 344, ls. 2–12). Conoco and Agrico will not realize any economic benefit from the cleanup of this site since they no longer own any property there. This consideration is another factor supporting a complete allocation of costs to Beazer.

**31.** The United States Supreme Court has held that CERCLA § 107 does not provide for the award of private litigants' attorneys' fees associated with bringing a cost recovery action; there-

fore, no attorneys' fees are included in any of the response costs awarded to Conoco or Agrico. *Key Tronic Corp. v. U.S.*, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994).

**32.** On June 10, 1992, Beazer realleged its Third-Party Complaint against Braswell.

**33.** Dent later amended the Complaint to which Beazer, Conoco, and Agrico thereafter answered as discussed more fully *infra*.

and Declaratory Judgment pursuant to 42 U.S.C. § 9613. On June 10, 1992, Beazer answered Dent's Amended Complaint and reasserted its claims for Response Costs pursuant to 42 U.S.C. § 9607(a), and Contribution pursuant to 42 U.S.C. § 9613(f).

On October 14, 1992, Conoco's and Agrico's Joint Motion for Summary Judgment was granted on Dent's common law claims based upon the court's ruling that the statute of limitations barred these claims. On November 13, 1992, Dent appealed the summary judgment to the United States court of appeals for the Fourth Circuit. On February 8, 1993, the appeal was dismissed as interlocutory.[34]

On August 8, 1991, and August 14, 1991, respectively, Conoco and Agrico filed their Third–Party Complaints against Braswell for Statutory Contribution pursuant to 42 U.S.C. § 9613(f)(1), and for a Declaratory Judgment pursuant to 42 U.S.C. § 9613(g)(2). On August 21, 1991, and August 30, 1991, respectively, Braswell answered Conoco's and Agrico's Third–Party Complaints, generally denying the allegations and specifically alleging that Conoco and Agrico had failed to state a cause of action for which relief could be granted; and, further, that the acts of Braswell did not cause or contribute to any of the contamination.[35]

On June 10, 1992, Beazer filed its Amended Third–Party Complaint against Braswell for Response Costs pursuant to § 107, Contribution pursuant to § 113(f), Declaratory Judgment pursuant to § 113(g), Common Law Indemnity, and Common Law Contribution. On July 2, 1992, Braswell requested that Beazer's Complaint be dismissed.

On August 11 and 21, 1992, respectively, Conoco and Agrico filed their Motions for Leave to File Cross–Claim and Memorandum in Support of Proposed Cross–Claim against Beazer. On September 2 and 8, 1992, Consent Orders were filed granting leave to amend their pleadings to assert Cross–Claims against Beazer and allowing Beazer to respond to the Cross–Claims by Conoco and Agrico. On September 14 and 17, 1992, Conoco and Agrico, respectively, filed Cross–Claims against Beazer for: Statutory Contribution pursuant to 42 U.S.C. § 9613(f)(1); Interest, Fees & Costs pursuant to 42 U.S.C. § 9607(a)(3); Declaratory Judgment pursuant to 42 U.S.C. § 9613(g); and Declaratory Judgment pursuant to 28 U.S.C. §§ 2201, 2202. Conoco included in its Cross–Claim against Beazer a claim for breach of contract (contractual indemnity).

On October 7 and 13, 1992, respectively, Beazer answered the Cross–Claims with eighteen (18) various defenses. Deliberately, Beazer did not assert any of its compulsory Counterclaims against Conoco or Agrico. However, on July 9, 1993, three years and seven months after Dent filed this case, and ten months after Conoco and Agrico served upon Beazer their Cross–Claims, Beazer filed a new and separate action against various parties (including Conoco and Agrico) entitled *Beazer East, Inc. v. United Navy, et al.* (Case No.: 2:93–1677–8) (Beazer's 1993 action). This action contained compulsory Counterclaims which arose out of the same transaction and events as in the Dent action. Shortly thereafter, on July 12, 1993, Beazer moved to consolidate this case, pending since 1989, with Beazer's 1993 action. On August 10, 1993, Conoco filed its Memorandum in Opposition to Beazer's Motion to Consolidate the actions on the following grounds: (1) Beazer's Motion was a delaying tactic; (ii) Beazer could not sustain the burden required for consolidation because Beazer was actually alleging compulsory Counterclaims against Conoco which were required to be brought in this case; and (iii) Beazer was improperly

---

**34.** Thereafter, on June 22, 1993, Dent, Conoco and Agrico entered into a Joint General Release and Covenant Not to Sue as to all claims and Counter–Claims between them. And, on June 28 and 29, 1993, respectively, an Order of Dismissal with prejudice and without costs was entered as to Conoco and Dent, and Agrico and Dent, for their respective claims and counterclaims.

**35.** Thereafter, as to the remaining claims and counterclaims between Braswell and Conoco, on November 16, 1993, Braswell and Conoco entered into a Joint General Release and Covenant Not to Sue. On May 5, 1994, Braswell and Agrico entered into a Joint General Release and Covenant Not to Sue.

attempting to bring an action for Contribution against Conoco.[36] Conoco and Agrico agreed to allow Beazer the right to amend its Reply in the Dent action to state its compulsory Counterclaims against Conoco and Agrico in the Dent action.

On August 10, 1993, the parties received Notice that Jury Selection was scheduled for August 16, 1993. On August 12, 1993, Conoco requested that all issues of fact which relate to the common law claims be heard by the same jury and that, directly following the conclusion of the jury trial, the court, as the finder of fact, hear the CERCLA claims. On August 16, 1993, the jury was drawn and the jury trial was scheduled to be heard September 22 through October 5, 1993.

On August 27, 1993, Beazer filed its Supplemental Counterclaim, Cross–Claim, and Third–Party Complaint against, *inter alia*, Braswell, Conoco and Agrico for: response costs pursuant to 42 U.S.C. § 9607(a); Statutory Contribution pursuant to 42 U.S.C. § 9613(f); Declaratory Judgment pursuant to 42 U.S.C. § 9613(g); and Unjust Enrichment.[37] On September 7, 1993, Dent filed its Reply to Beazers Supplemental Counterclaims generally denying the allegations. On September 13, 1993, Braswell served its Answer and Supplemental Counterclaim to Beazer's Supplemental Third–Party Complaint requesting that Beazer's Supplemental Complaint be dismissed and asserting a Counterclaim against Beazer for Contribution pursuant to § 113. On September 20, 1993, Beazer replied to Braswell's Counterclaim, generally denying the allegations therein.

On September 3 and 8, 1993, respectively, Conoco and Agrico filed their Reply and Supplemental–Alternative Counterclaims to the Supplemental Counterclaim, Cross–Claim and Third–Party Complaint of Beazer generally denying Beazer's allegations and specifically pleading the defenses of failure to State a Claim, Unclean Hands, Statute of Limitations, and Laches. By way of an additional defense and Supplemental–Alternative Counterclaim, Conoco included an action for Equitable Indemnification and supplemented its claim for contractual indemnification to recover costs and fees expended for, and associated with, expert fees, attorneys' fees, settlement fees and litigation costs. By way of additional defense and Supplemental–Alternative Counterclaims, Agrico included an action for equitable indemnification to recover costs and fees expended for, and associated with, attorneys' fees, settlement costs, and litigation costs. On September 9, 1993, Beazer filed its Motion to Dismiss the Supplemental Counterclaims of Conoco and Agrico. On September 20, 1993, Conoco filed its opposition to Beazer's Motion to Dismiss Conoco's Supplemental Counterclaim.[38] On September 20, 1993, Beazer filed twenty-eight (28) defenses in Reply to Conoco's and Agrico's Supplemental Alternative Counterclaims.

On September 21, 1993, the court held as matter of law that Conoco's indemnification provision in the Lease covered any claim made against Conoco arising out of any kind of use of the leased premises by Beazer.[39] (Pre–Trial Conference Tr. p. 61, ls. 19 through p. 62, l. 1, September 21, 1993).

The Dent common law claims were tried before a jury from September 22 to October 5, 1993. Two key factual issues regarding the indemnity claims by Conoco and Agrico against Beazer were submitted to the jury. The jury found that Dent's suit against Conoco resulted solely from Beazer's use of the

---

**36.** On August 16, 1993, Beazer's Motion to Consolidate was denied (Cercla Conference Tr. Excerpt, pp. 6–7, August 16, 1993).

**37.** On September 3, 1993, Beazer filed against Dent, Braswell and Conoco its Motion for Partial Summary Judgment on Liability. On September 20, 1993, Conoco filed its Reply to Beazer's Motion for Partial Summary Judgment On Liability. Thereafter, Beazer's Motion for Summary Judgment was denied as to Braswell, Conoco and Agrico.

**38.** Beazer's Motion to Dismiss was later denied.

**39.** Conoco and Beazer agreed, and the court ruled, that the indemnification agreement in the lease at issue was not ambiguous, and, therefore, the court, as a matter of law, would appropriately construe the indemnification agreement. (Pre–Trial Conference Tr. p. 20, l. 21 through p. 23, l. 1, September 21, 1993).

leased property. Similarly, the jury found that Agrico was sued solely as a result of Beazer's conduct. This court reserved unto itself the issue of reasonableness of the legal fees, the expert fees, as well as the settlement payment to Dent made by Conoco and Agrico. (Jury Tr. Vol. I, p. 7, ls. 14–16 through p. 8, l. 4; Cercla Tr. Excerpt p. 10, ls. 21–22, December 15, 1993). Conoco and Agrico argued that all the attorneys' fees were covered, first, as a result of the jury finding, or, second, all the fees were inextricably entwined with defense costs associated with claims covered by the indemnity.[40]

This court tried the CERCLA issues from October 18 through October 21, 1993, hearing the testimony of twenty-four witnesses as well as opening and closing arguments from counsel for the parties. In the interest of judicial economy, the testimony and exhibits admitted as evidence in the jury trial were admitted in the CERCLA trial. (Cercla Tr. Excerpt p. 3, l. 24 through p. 4, l. 5, October 18, 1993). On October 15, 1993, Conoco filed a Motion for A Directed Verdict and Motion for Judgment on Partial Findings against Beazer on the ground that the remaining Beazer claims arose from Koppers' use of the leased property, and because the jury determined that Beazer was *solely* responsible for all claims arising out of Koppers' use of the leased premises, Beazer's Counterclaims against Conoco were Moot.[41]

On Sunday, October 17, 1993, Beazer served its Motion to Amend and Supplement its Counterclaim, Cross–Claim and Third–Party Complaint against Conoco and Agrico, alleging, for the first time, the presence of lead as newly discovered evidence.[42] On October 18, 1993, Conoco and Agrico filed their

Memorandum in Opposition to Beazer's Motion to Amend on the following grounds: (1) Beazer had inadequately moved to amend under the *Federal Rules of Civil Procedure;* (ii) even had Beazer properly moved to amend, it failed to either allege or demonstrate any of the requisite considerations of "oversight, inadvertence, or excusable neglect, or when justice requires," and (iii) even had Beazer properly moved to amend or demonstrated any of the requisite considerations, the balancing of the equities, (prejudice to Conoco and Agrico, the necessity for additional discovery, and effect on the court's docket) compelled the conclusion that permission to amend should be denied. A hearing was held on October 18, 1993, and the court received evidence on the issue of whether the presence of lead was in fact "newly discovered evidence" as alleged by Beazer. (Cercla Tr. Excerpt p. 16, ls. 4–5, October 18, 1993). The evidence clearly demonstrated that Beazer was on notice of the presence of lead prior to the jury trial and as far back as early 1990. (Jury Tr. Vol. VI, p. 1038; Cercla Tr. Vol. I, p. 37, ls. 15–25; Plaintiff's Ex. 74—NUS Report dated August 16, 1988—). In liberally allowing parties to amend, the court considered granting a continuance, while imposing sanctions on Beazer due to the prejudice caused by Beazer's late amendment. In an effort to avoid a continuance, Conoco agreed to withdraw its objection to Beazer's amendment, and also to withdraw its Motions for Directed Verdict and Judgment on Partial Findings. (Cercla Tr. Excerpt p. 103, ls. 3–7, October 18, 1993). Thereafter, Beazer was granted leave to Amend and Supplement its Counterclaim, Cross–Claim and Third–Party Complaint against Conoco and Agrico.[43] However, due

**40.** On December 15, 1993, Conoco and Beazer agreed that in the event the court determined Conoco was not entitled to attorneys' fees related to the defense of the alleged non-covered claims asserted for Conoco's alleged wrongful conduct, the attorneys' fees attributable to the defense of those claims was $50,527.95. (See Cercla Tr. Vol. VI, p. 10, ls. 5–15, 17).

**41.** Conoco maintained, however, that its claims against Beazer for the allocation of response costs remained to be decided by the court. This would necessarily require Conoco to present its case initially so as to establish that, as between Conoco and Beazer, Beazer was solely responsi-

ble for the cleanup of the property in question, and, likewise, responsible for any response costs incurred, or to be incurred, by Conoco. This motion was later withdrawn. (Cercla Tr. Excerpt p. 12, l. 25 through p. 13, l. 9, October 18, 1993).

**42.** This Motion was not filed until October 18, 1993.

**43.** Beazers' Supplemental Counterclaim, Cross–Claim and Third–Party Complaint against Conoco expanded Beazer's claim against Conoco to include potentially hazardous substances in the

to Beazer's knowledge of facts, long before the commencement of the trial, that allegedly gave rise to the new Counterclaim made during the trial, which clearly prejudiced Conoco, this court determined that a monetary sanction was appropriate, and the court reserved the right to determine the amount thereof. (Cercla Tr. Excerpt p. 104, l. 10 through p. 105, l. 10, October 18, 1993).

On October 18, 1993, Beazer filed its Supplemental Brief in Opposition to Conoco's and Agrico's Claims for Indemnity. On October 25, 1993, Conoco filed its Memorandum in Response to Beazer's Supplemental Brief on indemnification.

On October 26, 1993, Conoco filed its second Motion for Judgment on Partial Findings as to Beazer's Counterclaims and Supplemental Cross–Claims on the following grounds: (1) the jury determination that Beazer was *solely* responsible for all claims arising from Koppers' use of the leased premises, together with Beazer's express admissions before the court, entitled Conoco to a favorable judgment as to all allegations contained in Beazer's Counterclaims and Supplemental Counterclaims; and (ii) Beazer failed to prove entitlement to recovery for response costs under its Supplemental Counterclaims because it was unable to produce any evidence that lead constituents would increase response costs,[44] and because Conoco demonstrated through expert testimony that lead would not cause the incurrence of any response costs. (Cercla Tr. Vol. II, p. 100, ls. 10–17; p. 109, ls. 4–12). On October 26, 1993, Conoco filed an Affidavit in Support of Request for Attorneys' Fees. On October 28, 1993, Agrico filed its Memorandum and Schedule of Fees in Support of Attorneys' Fees. On November 3, 1993, Conoco filed an Amended and Supplemental Affidavit in Support of Conoco's Request for Attorneys'

Fees, which was admitted into evidence without objection. On December 15, 1993, the court heard final arguments on the pending CERCLA issues, and, thereafter, the parties then submitted proposed orders to the court.

On October 12, 1994, while a final decision was pending in this case, Beazer filed a Motion to Reopen the Record to allow the submission of additional evidence revealing that Agrico and Conoco were liable for a far larger share of the response costs for the Dent property than previous evidence had indicated. This court denied the motion to reopen by an order dated January 9, 1995, in which the court stated that the motion was untimely, that there was no indication that the evidence was not available to the parties at the time of trial by additional testing or other expert analysis, and that there was potential prejudice to the nonmoving parties. On January 23, 1995, this court issued a subsequent order, pursuant to a request by Beazer's counsel to allow the post-trial offering of proof pursuant to Federal Rule of Evidence 103(a)(2). The court declined Beazer's request because the court held that it had already considered this evidence and that the defendant had previously "proffered" such evidence for the record.

On January 25, 1995, Beazer filed a motion to reconsider this court's orders of January 9, 1995, and January 23, 1995. A hearing was held on February 14, 1995, and the court denied this motion. After further correspondence from the parties, another hearing was held on March 2, 1995, at which hearing this court proposed a method by which the record could be reopened if Beazer would agree to certain conditions. Finally on May 2, 1995, this court held a telephone conference, during which this court again denied Beazer's motion for reconsideration because Beazer was not willing to comply with the suggested conditions. The court then informed the par-

---

site designated as the Superfund area, as well as the four acre parcel known as the leased area, as evidenced by the respective parties' submissions of evidence which this court views as proper under Rule 15(b), *FRCP*. (*See* Cercla Tr. Excerpt p. 17, ls. 2–5; and p. 23 l. 20 through p. 25, l. 1–7, October 18, 1993).

**44.** On December 15, 1993, the court noted that Beazer's expert did not testify that the lead on the property would increase or require the expenditure of response costs, and, therefore, did not overcome Conoco's evidence that the lead levels detected on the property would not increase response costs. (Cercla Tr. Excerpt, Motion for Directed Verdict, p. 129, l. 18 through p. 130, l. 2, October 18, 1993).

ties that this order would be forthcoming. On November 27, 1995, Beazer filed yet another similar motion to supplement the record to which Conoco and Agrico filed opposition. This court feels that the filing of this last motion is inappropriate at this time and it denies this motion for the reasons that it has previously stated in its denial of Beazer's earlier motions to open or supplement the record or reconsider its order on those subjects.

Robert H. Bickerton, Asst. U.S. Atty., Charleston, SC, for Plaintiff.

Douglas A. Westbrook, Charleston, SC, for Defendant.